AMERICAN MANUFACTURING MUTUAL INSURANCE COMPANY, Plaintiff-Counter-Claimant-Defendant-Appellee,.

v.

TISON HOG MARKET, INC., Thomas T. Irvin, Commissioner of Agriculture for the State of Georgia as Trustee for any and all claimants under bonds issued for Thurstan D. Paulk, Jr. d.b.a. Paulk Livestock Co., and Coffee County Stockyard, Inc., Defendants-Appellants,

Gainesville Livestock Market Inc., Madison Hog Market, Inc., d.b.a. Townsend Livestock Market, et al., Defendants-Counter-Claimants-Appellants.

No. 98-8506.

United States Court of Appeals,

Eleventh Circuit.

Aug. 3, 1999.

Appeals from the United States District Court for the Southern District of Georgia. (No. CV-595-86), William T. Moore, Jr., Judge.

Before COX, Circuit Judge, FAY, Senior Circuit Judge, and NANGLE[*], Senior District Judge.

COX, Circuit Judge:

Plaintiff American Manufacturing Mutual Insurance Company ("American") filed this action seeking a declaratory judgment that it was not liable to the defendant creditors on two surety bonds. The district court entered summary judgment in American's favor and the defendants appeal. For the reasons that follow, we vacate and remand.

*I. Background*

The Packers and Stockyards Act of 1921, 7 U.S.C. § 181 *et seq.,* (the "PSA") and its implementing regulations require that every livestock dealer execute and maintain a reasonable bond to secure the performance of its obligations. *See* 7 U.S.C. § 204; 9 C.F.R. § 201.29. The PSA's bonding requirement was designed "to safeguard the farmers and ranchers who produce cattle against the losses they would suffer if they sold their livestock to insolvent or defaulting purchasers." *Travelers Indem. Co. v. Manley Cattle Co.,*

---

[*]Honorable John F. Nangle, Senior U.S. District Judge for the Eastern District of Missouri, sitting by designation.

553 F.2d 943, 945 (5th Cir.1977) (citations omitted).

Two livestock dealers, Thurston Paulk, d/b/a Paulk Livestock Company ("Paulk Livestock"), and Coffee County Stockyard, Incorporated ("Coffee County Livestock"), applied to American to serve as a surety and issue bonds for them to meet the PSA's requirements.[1] The applications for both bonds contained agreements to indemnify American for any losses that it might incur as a result of their issuance. The principal on the first bond was Thurston Paulk, d/b/a Paulk Livestock. The application was signed by Thurston Paulk in his role as the sole proprietor of Paulk Livestock. The indemnification agreement contained the purported signatures of Thurston Paulk, Betty Paulk, and a witness. The principal on the second bond was Coffee County Livestock. The application contained the signature of Thurston Paulk in his role as president of Coffee County Livestock. The indemnification agreement contained the purported signatures of Thurston Paulk, Betty Paulk, Ashley Paulk, and a witness. American relied upon the information contained in the forms and the alleged genuineness of the signatures in making the decision to issue the bonds.

After the bonds were issued, Paulk Livestock and Coffee County Livestock purchased numerous hogs from defendants Tison Hog Market, Inc.; Gainesville Livestock Market, Inc.; Madison Hog Market, Inc., d/b/a Townsend Livestock Market; South Carolina Farm Bureau Marketing Association; and Georgia Farm Bureau Marketing Association, Inc. When the defendant hog sellers did not receive payment for the hogs, they made claims against the surety bonds for the purchase money that they were due. Defendant Thomas T. Irvin, Commissioner of the Department of Agriculture for the State of Georgia, was the trustee for the bonds. In his role as trustee, he notified American of the claims being made on the bonds by the livestock sellers.

American conducted an investigation and learned that the bonds' indemnification agreements

---

[1]"A surety is a person who binds himself for the payment of a sum of money, or for the performance of something else, for another who is already bound for such payment or performance." 72 C.J.S. *Principal and Surety* § 3 (1987). The principal is the party who is bound for some payment or performance, and the obligee or creditor is the party who has a right to enforce payment or performance by the principal or surety. *See id.* at §§ 4-5.

contained forged signatures. In particular, American discovered evidence suggesting that: (1) Ashley Paulk had not signed or authorized anyone to sign his name to the Coffee County Livestock bond indemnification agreement; and (2) Betty Paulk had not signed or authorized anyone to sign her name to either bond's indemnification agreement. American claimed that it would not have issued the bonds had it known that Betty and Ashley Paulk had not agreed to indemnify it, and it declared the bonds rescinded and returned all the premiums.

American then brought this action seeking a declaratory judgment relieving it from liability to the defendants on the ground that the bonds were void *ab initio* under Georgia insurance law due to the fraudulent and material misrepresentations of the bonds' principals. American argued that the principals had forged the signatures of Betty and Ashley Paulk on the indemnification agreements in order to induce it into issuing the bond. The defendants answered and counterclaimed seeking judgment for the amount due them on the bonds. They argued that Georgia insurance law did not apply to the surety contracts at issue in this case and that under both federal and Georgia surety law, American was still liable on the bonds.

Cross motions for summary judgment were filed. The district court granted American's motion for summary judgment and denied those filed by the defendants. In its order, the court first held that the PSA did not preempt Georgia law. Then, applying Georgia insurance law, it concluded that the bonds were void *ab initio.* This appeal by the defendant livestock sellers and the Commissioner followed.

## II. Standard of Review

We review a district court's entry of summary judgment *de novo. See Ross v. Clayton County, Ga.,* 173 F.3d 1305, 1307 (11th Cir.1999). Summary judgment is proper where there are no disputes of material fact and the movant is entitled to judgment as a matter of law. *Id.*

## III. Discussion

The ultimate issue presented by this appeal is whether a surety in Georgia is liable on its bond to creditors when the principal fraudulently induces the surety to issue the bond. The defendants argue that American is still liable on the bonds under general surety law because fraud committed by a principal alone

in inducing a surety to issue a surety bond does not release the surety from liability. They contend that the district court erroneously applied Georgia insurance law to determine American's liability when it should have applied either federal common law or Georgia surety law. American responds that the district court correctly found no preemption and correctly applied Georgia insurance law.

Although the ultimate issue in this appeal is American's liability on the bonds, the key question that we must resolve first is what law applies to determine the liability. We begin our discussion, therefore, by examining whether the passage of the PSA has preempted state law regarding the liability of a surety on a bond obtained by a principal's fraud.

Pursuant to the Supremacy Clause of the United States Constitution, a federal statute may preempt state law in certain circumstances. *See* U.S. Const. art. VI, cl.2; *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). There are three types of preemption: (1) express preemption; (2) field preemption; and (3) conflict preemption. *See Lewis v. Brunswick Corp.,* 107 F.3d 1494, 1500 (11th Cir.1997), *cert. dismissed,* --- U.S. ----, 118 S.Ct. 1793, 140 L.Ed.2d 933 (1998). We can dispense with the first two types of preemption readily. Express preemption occurs when Congress explicitly defines the extent to which federal law applies instead of state law. *Id.* There is no express preemption in this case because there is no language in the PSA that on its face preempts the application of state defenses.[2] Field preemption occurs when Congress regulates a field so pervasively or passes a law that touches on a field implicating a dominant federal interest that an intent to preempt state law can be inferred. *See Teper v. Miller,* 82 F.3d 989, 993 (11th Cir.1996). There is no field preemption because there is no indication that Congress intended to exclusively regulate the entire livestock trading industry when passing the PSA.[3]

---

[2]Section 228c provides that "No requirement of any State ... with respect to the bonding of packers or prompt payment by packers for livestock purchases may be enforced upon any packer operating in compliance with the bonding provisions under section 204 of this title...." 7 U.S.C. § 228c. It also provides, however, that "this section shall not preclude a State from enforcing a requirement, with respect to payment for livestock purchased by a packer at a stockyard subject to this chapter, which is not in conflict with this chapter or regulations thereunder ..." *Id.* As a result, on its face, this section only preempts certain types of inconsistent state laws.

[3]We note that there are some areas in the industry that Congress did not mean to regulate and where state law continues to apply. *See, e.g., Adams v. Greeson,* 300 F.2d 555 (10th Cir.1962); *Sig Ellingson &*

The final type of preemption is conflict preemption and it requires some additional discussion. This type of preemption occurs either when "it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984) (citations omitted). In order to determine if there is conflict preemption, we must examine both the federal and state law that govern a surety's liability on a bond that has been obtained by fraud of a principal.

We turn first to the federal law that would apply to American's fraud defense. The PSA does not have any explicit provision dealing with fraud by a principal toward a surety, and there is no case law applying it to such a situation. We turn, therefore, to state common law and general principles of suretyship as a source for federal common law to fill the gap. *See Nachwalter v. Christie,* 805 F.2d 956, 959 (11th Cir.1986). We may only borrow from the common law of the states when it is consistent with the policies underlying the federal statute being applied. *Id.; see Textile Workers Union of America v. Lincoln Mills of Al.,* 353 U.S. 448, 456-57, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957).

It is well established under the common law of suretyship that "fraud or misrepresentation practiced by the principal alone on the surety, without any knowledge or participation on the part of the creditor or obligee, in inducing the surety to enter into the suretyship contract will not affect the liability of the surety." 72 C.J.S. *Principal and Surety* § 61 (1987); 74 Am.Jur.2d *Suretyship* § 133 (1974); *see also* Restatement (Third) of Suretyship and Guaranty § 12(2) (1996).[4] From a practical standpoint, this common law treatment of a principal's fraud is the only one that makes sense. A creditor does business with a principal in reliance

---

*Co. v. De Vries,* 199 F.2d 677 (8th Cir.1952).

[4]As stated by the most recent Restatement of the Law:

> [i]f the secondary obligor's assent to the secondary obligation is induced by a fraudulent or material misrepresentation by either the principal obligor or a third person upon which the secondary obligor is justified in relying, the secondary obligation is voidable by the secondary obligor unless the obligee, in good faith and without reason to know of the misrepresentation, gives value or relies materially on the secondary obligation.

Restatement (Third) of Suretyship and Guaranty § 12(2) (1996).

upon the existence of a bond. The bond provides security for the creditor because normally the creditor would have no way of knowing whether the principal is insolvent or otherwise an unreliable party with which to engage in business. *See* 72 C.J.S. *Principal and Surety* § 2 (1974) ("[u]nder a contract of suretyship the obligee or creditor is not under the necessity of seeing that the principal performs his conditions, since the surety must do so."). If the creditor's ability to recover on a bond was dependent on the accuracy of the principal's representations to the surety, then the value of the bond to the creditor would be greatly lessened because the creditor would have no way of knowing what representations were made in the procurement of the bond. More importantly for the case at bar, this common law approach is consistent with and furthers the purpose of the PSA. The common law enables a livestock seller to deal freely with livestock dealers knowing that the required bond will protect them in the event of a default even if the principal hid facts from the surety when obtaining the bond. We conclude, therefore, that federal law under the PSA would adopt the common law of suretyship regarding a surety's liability on a bond obtained by a principal's fraud.

We now turn our attention to state law. If the applicable law in Georgia is the same as the federal law and does not present an obstacle to the PSA's purposes, then there is no conflict preemption and we will apply the state law. The district court concluded that because American agreed to indemnify third parties in the event of certain contingencies, the bond was an "insurance contract" and American was an insurer governed by Title 33 of the Georgia Code. *See* O.C.G.A. §§ 33-1-2(2) and (4).[5] Under the Georgia insurance code, fraudulent misrepresentations or material misrepresentations made in the procurement of an insurance contract prevent a recovery under the contract. *See* O.C.G.A. § 33-24-7. The district court applied § 33-24-7 and concluded that there was undisputed evidence of fraud that excused American from liability.

Instead of applying this insurance law, however, the district court should have applied Georgia surety law. The surety bonds in this case are surety contracts that are not governed exclusively by the insurance law

---

[5]The insurance section of the Georgia Code defines an insurance contract as "a contract which is an integral part of a plan for distributing individual losses whereby one undertakes to indemnify another or to pay a specified amount or benefits upon determinable contingencies," *see* O.C.G.A. § 33-1-2(2), and an insurer as "any person engaged as indemnitor, surety, or contractor who issues insurance, annuity or endowment contracts, subscriber certificates, or other contracts of insurance...." *See* O.C.G.A. § 33-1-2(4).

of Georgia. Although the insurance code section does refer to a "surety" within the definition of a possible insurer, *see* O.C.G.A. § 33-1-2(4), the only type of insurance involving sureties addressed in Title 33 is surety insurance. The Code defines surety insurance as "insurance guaranteeing the performance of contracts other than insurance policies and guaranteeing and executing bonds, undertakings, and *contracts of suretyship. ...*" O.C.G.A. § 33-7-7(2) (emphasis added).[6] Among other things, surety insurance is insurance that a surety will perform its obligations under a surety contract. This definition, by its clear terms, indicates that surety insurance is distinct and separate from surety contracts like those at issue in this case.[7]

The Georgia Code contains an entirely separate title that applies to suretyship contracts. *See* O.C.G.A. § 10-7-1 *et seq.* The chapter defines a contract of suretyship as one "whereby a person obligates himself to pay the debt of another in consideration of a benefit flowing to the surety ..." O.C.G.A. § 10-7-1. This is the commonly understood definition of a surety relationship and describes the situation that we have in the case at bar. The Georgia Code does not contain a statement as to the effect of a principal's fraud on a surety's liability to the creditor. Georgia courts, however, have applied the common law and held that a surety is still liable to a creditor even if the principal commits fraud so long as the creditor does not participate in the fraud. *See W.T. Rawleigh Co. v. Oliver,* 67 Ga.App. 748, 21 S.E.2d 490 (1942); *Broughton v. Jos. Lazarus Co.,* 13 Ga.App. 153, 78 S.E. 1024 (1913).

---

[6]Surety insurance also includes:

      (1)     Fidelity insurance, which is the insurance guaranteeing the fidelity of persons holding positions of public or private trust;

          ...

      (3)     Insurance indemnifying banks ... against loss resulting from any cause of bills of exchange, notes, bonds, securities....

O.C.G.A. § 33-7-7.

[7]We recognize that it may be that a surety is subject to some regulation and litigation in Georgia as an insurer. *See, e.g., Congress Re-Insurance Corp., Inc. v. Archer-Western Contr., Ltd.,* 226 Ga.App. 829, 487 S.E.2d 679 (1997) (surety subject to service of process under O.C.G.A. § 33-5-54). As discussed below, however, this fact has no bearing on the impact of substantive provisions of Georgia insurance law on surety contracts.

American contends that the Georgia legislature amended the insurance Code in 1961 and added section 33-24-7 (dealing with misrepresentations) with the intention of having it apply to all insurance contract applications, including applications for surety contracts. *See State Farm Mut. Auto. Ins. Co. v. Anderson,* 107 Ga.App. 348, 130 S.E.2d 144 (1963). As a result, American argues, the Georgia courts' decisions in *W.T. Rawleigh* and in *Broughton* are no longer good law. Although the legislature changed the law for all insurance contracts in 1961, there is no indication that section 33-24-7 was meant to change the common law rule relative to surety contracts. We note, for instance, that Title 10 and Title 33 both contain separate sections dealing with bad faith failure to pay. Although almost identical, the section in Title 33 applies to bad faith failure to pay on an insurance contract, while the one in Title 10 applies to bad faith failure to pay on a surety contract. *Compare* O.C.G.A. § 33-4-6 with O.C.G.A. § 10-7-30; *see McDevitt & Street Co. v. K-C Air Conditioning Service, Inc.,* 203 Ga.App. 640, 645-46, 418 S.E.2d 87 (1992); *Columbus Fire & Safety Equip. Co., Inc. v. American Druggist Ins. Co., Inc.,* 166 Ga.App. 509, 304 S.E.2d 471 (1983). The fact that separate sections exist suggests that the Georgia legislature meant for separate laws to apply to each type of contract. Furthermore, the Georgia legislature changed the common law treatment of bad faith failure to pay when it included such a provision in the suretyship title of the Georgia Code. *See Travelers Indem. Co. v. Sasser & Co.,* 138 Ga.App. 361, 226 S.E.2d 121 (1976). The legislature's failure to enact a provision similar to section 33-24-7 in the suretyship title of the Code suggests that it did not mean to alter the common law of suretyship contracts regarding fraud by a principal.[8]

As the above analysis indicates, the federal law regarding fraud by a principal is the same as the Georgia law on the subject. Since there is no conflict and Georgia law does not frustrate the purposes of the PSA, we find no conflict preemption of Georgia surety law. Applying the common law to the case at bar, there is no evidence that the defendants participated in any fraud. The fraud was committed solely by the principals. Under these circumstances, American is not relieved of liability on the bonds. *See Broughton,*

---

[8]American also argues that the Georgia surety code only applies to uncompensated sureties and that compensated sureties like that in the case at bar are governed by the insurance code. We find no merit to this contention.

13 Ga.App. at 153, 78 S.E. 1024. As a result, the district court's entry of summary judgment for American on the fraud defense was in error.

American's motion for summary judgment is also grounded upon several additional state law arguments as to why it is not liable on the bonds. The district court did not address these arguments because it disposed of the case on the fraud defense. We leave the questions of whether these defenses are preempted due to a conflict with federal law and whether they have merit to the district court to decide on remand.

*IV. Conclusion*

For the foregoing reasons, the district court's judgment is vacated, and we remand this case for further proceedings consistent with this opinion.

VACATED AND REMANDED.