RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0453p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

COMMERCIAL MONEY CENTER, INC.; COMMERCIAL
SERVICING CORPORATION,

*Plaintiffs,*

CITIBANK, N.A.; JP MORGAN CHASE BANK, NA,

*Plaintiffs-Appellees,*

*v.*

ILLINOIS UNION INSURANCE COMPANY,

*Defendant-Appellant.*

Nos. 06-3767/4190/4301/4492

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
Nos. 02-16007; 02-16009; 02-16000—
Kathleen McDonald O'Malley, District Judge.

Argued: September 10, 2007

Decided and Filed: November 14, 2007

Before: GUY, ROGERS, and McKEAGUE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Stephen A. Cozen, COZEN & O'CONNOR, Philadelphia, Pennsylvania, for Appellant.
Barry R. Ostrager, SIMPSON, THACHER & BARTLETT, New York, New York, for Appellees.
**ON BRIEF:** Stephen A. Cozen, Richard C. Mason, COZEN & O'CONNOR, Philadelphia,
Pennsylvania, for Appellant. Barry R. Ostrager, George S. Wang, SIMPSON, THACHER &
BARTLETT, New York, New York, for Appellees.

———————————

## OPINION

———————————

RALPH B. GUY, JR., Circuit Judge. This case concerns one of a number of disputes
transferred to the Northern District of Ohio as part of the multidistrict litigation captioned *In re:
Commercial Money Center, Inc. (CMC) Equipment Lease Litigation* (No. 02-16000), which arose
out of the collapse of CMC's equipment leasing business in what is alleged to have been a Ponzi-
type scheme. When CMC filed for bankruptcy, the district court was left to sort out the claims and
counterclaims of nearly twenty banking institutions and a half-dozen insurance companies arising

1

out of various lease-backed transactions with CMC and CMC-related entities. These consolidated appeals involve the dispute between several parties to one such transaction—specifically, the dispute between Illinois Union Insurance Company on one hand, and Citibank, N.A., and JP Morgan Chase Bank, N.A., as trustee for Citibank, on the other, concerning Illinois Union's obligations under an insurance policy containing a negotiated Collateral Security Insurance Endorsement (Coverage E).[1]

On appeal, Illinois Union contends that the district court erred in finding, on a 12(c) motion for judgment on the pleadings: (1) that Illinois Union's policy was "in substance" a surety contract; (2) that Chase, as trustee for Citibank, was the obligee under that surety contract such that it was entitled to recover without regard to the alleged fraud of the principal obligor; and (3) that Illinois Union was precluded by the negotiated waiver of defenses from avoiding the obligations under the Policy on the grounds of fraudulent inducement. Second, Illinois Union argues that, even if correct on these issues of liability, the district court erred in calculating the damages by reference to the lease payments as opposed to the debt those payments secured. Finally, Illinois Union argues that the district court abused its discretion in denying the motion for leave to amend its pleadings. After review of the record and the arguments presented on appeal, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.

CMC was purportedly in the business of leasing equipment and vehicles to numerous lessees in exchange for lease payments. It is alleged by the banks and insurance companies that the majority of CMC's lease business was a sham as many leases were nonexistent, nonperforming, or actually disguised usurious loans. Problems with the leases were apparently concealed by CMC's use of a Ponzi-type scheme in which early investors were paid with funds obtained from later investors. Overall, the banks advanced more than $400 million secured in some way by the lease payments, while the insurance companies provided assurances of payment on the leases. Most of the insurance companies issued explicit surety contracts called "Lease Bonds" that identified CMC as the obligee. Illinois Union, which was in the minority of insurers, issued insurance policies that included collateral security insurance coverage under varying endorsements.

The financing transactions took four basic forms: (1) some banks purchased the income stream directly from CMC; (2) some banks purchased the income stream from third parties who purchased from CMC; (3) some banks lent funds to third parties who purchased the income stream from CMC or its related entities; and, finally, (4) several banks purchased notes from CMC special purpose entities that were secured by and to be repaid from the income stream from the leases. The transaction in this case fell under this last category and was essentially a "securitization" of the lease payments.

Specifically, CMC sold pools of leases to its special purpose entity, CMC Lease Funding 2000-220, LP (Lease Funding),[2] and Lease Funding issued notes under the terms of an Indenture to Chase, as Trustee for Citibank, that were secured by and to be repaid from the lease payments. Under the Sales and Servicing Agreement (SSA) entered into between CMC as "Seller," Lease Funding as "Issuer," Chase as "Trustee," and Illinois Union as both "Credit Insurer" and "Servicer," the leases were conveyed from CMC to Lease Funding, Lease Funding confirmed its pledge of a

---

[1] Although Chase/Citibank refers to the insurance policy as the Surety Contract, the legal issue before us is whether the insurance contract established a surety relationship. Accordingly, we will refer to Illinois Union's insurance contract as the "Policy" or the "Endorsement." Likewise, we do not refer to Illinois Union as one of the "Sureties."

[2] The sole general partner of Lease Funding was CMC Lease Funding, LLC, a limited liability company of which CMC was the sole member.

security interest in the lease payments to the noteholders, and Commercial Servicing Corporation (CSC), a CMC-related entity, was identified as an approved "Sub-servicer" for the leases. The SSA and the Indenture required issuance of the credit insurance, in which the Indenture granted a further security interest.

Illinois Union had provided property and casualty insurance for CMC's leasing business, but had declined to provide collateral security insurance in the past. Illinois Union alleges that CMC continued to solicit such coverage and that Illinois Union relented based on representations that Illinois Union now contends were materially false. Although the collateral security insurance issued by Illinois Union varied in language, we are concerned with the endorsement negotiated with the heavy involvement of counsel for Citibank. That Collateral Security Insurance Endorsement—issued on the same date that the Indenture and SSA were executed—named "CMC Lease Funding 2000-220, LP" as the "Insured" and Chase as trustee for "the holders of notes issued under the Indenture" as the "Additional Insured/Loss Payee." Illinois Union has also alleged that several written indemnity agreements were executed in its favor by CMC, CMC entities, and CMC principals Anita and Sterling Pirtle.

After the transaction closed on January 18, 2001, additional notes were issued under the Indenture, those notes were secured by additional leases, and those leases were added to the Schedule A of the Policy. Chase stopped receiving payment in full in December 2001, and Chase's claims under the Policy were denied by Illinois Union. Among the host of lawsuits spawned by the collapse of the leasing business were CMC's action against Illinois Union, Illinois Union's counterclaims seeking rescission and adding Chase as a party, and Chase/Citibank's action against Illinois Union and others including CMC, Lease Funding, and CSC. Bankruptcy filings followed, and cases from all over were consolidated and transferred to the United States District Court for the Northern District of Ohio.

Illinois Union's Second Amended Counterclaims sought, in pertinent part, rescission of the Policy and the SSA for fraud, as well as declaration that preexisting losses were not covered and that the Policy was void as against public policy. (Counterclaims 7, 8, and 9). Illinois Union specifically alleged that CMC made material misrepresentations that induced it to issue collateral security insurance. Those misrepresentations included: that the underlying leases were valid; that strict underwriting guidelines were used in granting the leases; that an independent third party was retained to verify the leases; that the lease default rates were below certain levels; that losses from defaults were minimized by repossession and re-leasing of equipment; and that no claims had been made for defaults on the leases. Some of these representations were also the subject of CMC's written warranties in the SSA. It is alleged that a significant number of the leases were either nonexistent or in default even before Illinois Union issued the Policy.

Coordination of the proceedings led to the filing in January 2003 of a collective motion by all of the banks for judgment on the pleadings against all of the sureties and insurers that sought rescission on the grounds of fraud. That consolidated motion was granted in part and denied in part in two orders entered on August 19, 2005. In the "Lead Opinion," the district court addressed the banks' claims against the sureties that had issued Lease Bonds and concluded, *inter alia*, that additional evidence would be necessary to determine whether the banks were the true intended obligees despite the express designation of CMC as the obligee. The second order, on the other hand, pertained specifically to the claims of the seven banks seeking to recover from Illinois Union (IU Order). The district court not only concluded that all of the insurance policies were in essence surety contracts under which the banks were the intended obligees, but also singled out the transaction with Chase/Citibank as most clearly providing a suretyship for the benefit of Chase/Citibank and for waiver of Illinois Union's defenses.

The district court's conclusions led Chase and Citibank to seek entry of final judgment against Illinois Union on their complaint and partial final judgment in their favor on Illinois Union's counterclaims (Nos. 02-16009/02-16007). Illinois Union protested, contested the calculation of damages proposed by Chase/Citibank, argued that the damage theory was inconsistent with treatment of the transaction as a suretyship, and complained that it should be allowed to amend its counterclaims before entry of judgment. A stay of proceedings precluded Illinois Union from seeking leave to amend until March 2006, at which time Illinois Union filed its motion to amend. In an order entered April 20, 2006, the district court rejected Illinois Union's arguments, refused to defer entry of judgment in order to allow Illinois Union to amend its pleadings, determined that the damages would be based on the scheduled payments on the underlying leases, and concluded that partial final judgment should be entered on the counterclaims under Fed. R. Civ. P. 54(b).

Partial final judgment was entered against Illinois Union on its 7th, 8th and 9th counterclaims on August 4, 2006, and final judgment was entered against Illinois Union on the Chase/Citibank complaint on August 31, 2006. On October 3, 2006, as part of an omnibus order addressing a litany of motions to amend, the district court denied Illinois Union's motion to amend the counterclaims with respect to Chase/Citibank but allowed amendment as to other parties. The final judgment declared that:

> Illinois Union Policy FIC-700241 (the "Policy") is valid and enforceable and Illinois Union is not entitled to rescind the Policy on the basis of CMC's alleged fraud, illegality of the Leases, certain Leases already being delinquent when the Policy was issued, or on any other ground, and judgment is granted in favor of Plaintiffs on the [First, Second, and Third] Causes of Action[.]

Illinois Union was ordered to pay to Chase, as trustee for Citibank, $46,063,297.45 in damages, $10,959,912.39 in prejudgment interest, and reasonable attorney fees to be determined separately. The judgment was also subject to set-off for any unaccounted for lease payments received by Chase, as well as the interest on any such payments. Illinois Union appealed separately from the orders and judgments entered against it.[3]

## II.

Illinois Union challenges the decision to grant judgment on the pleadings to Chase/Citibank as both wrong on the merits and procedurally flawed. As to the latter, Illinois Union argues that the district court's consideration of matters outside the pleadings improperly converted the motion to one for summary judgment under Fed. R. Civ. P. 56(c). *Max Arnold & Sons, LLC v. W.L. Hailey & Co., Inc.*, 452 F.3d 494, 503 (6th Cir. 2006).

As the district court noted and even Illinois Union concedes, however, documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss. FED. R. CIV. P. 10(c). In addition, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999). Somewhat disingenuously, Illinois Union argues that the Indenture and so-called "estoppel letters" attesting to the validity of the insurance policy were not attached to *its* counterclaim. In fact, the Policy, the SSA, and the Indenture were attached to the Chase/Citibank complaint, the letters were attached to the

---

[3]The district court noted in the April 2006 Order that Illinois Union had resolved its disputes with all of the banks except Chase/Citibank in court-ordered mediation.

Chase/Citibank answer to the counterclaims, and the letters were apparently also among the "Referenced Documents" listed in the Policy.

Illinois Union also argues that Chase/Citibank's submission of a copy of an amicus brief filed by an insurance organization in another case converted the 12(c) motion to a Rule 56(c) motion. A court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment. *Lynch v. Leis*, 382 F.3d 642, 648 n.5 (6th Cir. 2004); *Kostrzewa v. City of Troy*, 247 F.3d 633, 644 (6th Cir. 2001). This brief was a public record and was offered not to establish any disputed facts, but to incorporate the arguments articulated in an analogous situation. Indeed, Illinois Union's objection at the time was to Chase/Citibank's reliance on the arguments made in "an irrelevant 'lawyer's brief' prepared in an unrelated matter," but was not that its submission resulted in conversion of the motion to one for summary judgment. Failure to expressly exclude these materials in deciding the motion under Rule 12(c) did not convert the motion to dismiss into one for summary judgment. *Song v. City of Elyria*, 985 F.2d 840, 842 (6th Cir. 1993).

Illinois Union also argues that a finding of suretyship was improper on a 12(c) motion because it contradicted the allegations of Chase/Citibank that Illinois Union was an "insurer" and the assertion of a claim for breach of the implied duty of good faith and fair dealing. We find that the assertion of insurance contract claims did not constitute "purposeful admission" of facts that should preclude Chase/Citibank from arguing that the substance of the transaction was to create a surety relationship. *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 340-41 (6th Cir. 1997). Judicial admissions of fact must be deliberate and clear, while legal conclusions are rarely considered to be binding judicial admissions. *Id*. at 341. We are not persuaded that these averments should preclude Chase/Citibank from arguing that the transaction as a whole created a surety contract as a matter of law. *See Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 394-95 (6th Cir. 2007). This brings us to the merits of the district court's decision.

## A.     Standard of Review

We review the district court's decision granting a Rule 12(c) motion for judgment on the pleadings under the same *de novo* standard as one granting a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001). Under that standard, we construe the complaint in the light most favorable to the nonmoving party, accept the well-pled factual allegations as true, and determine whether the moving party is entitled to judgment as a matter of law. *United States v. Moriarty*, 8 F.3d 329, 332 (6th Cir. 1993). We need not accept the plaintiff's legal conclusions or unwarranted factual inferences as true. *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000). To state a valid claim, a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory. *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005), *cert. denied*, 547 U.S. 1111 (2006).[4]

At the heart of this appeal is the district court's conclusion that, although the Endorsement took the form of an insurance policy, the substance of the transaction as a whole was indistinguishable as a matter of law from the express surety contracts issued by other banks and insurance companies. Illinois Union maintains that the Endorsement was simply "credit insurance," which is distinct from a surety contract and is subject to insurance defenses. The parties do not

---

[4] We have noted some uncertainty concerning the scope of *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007), in which the Supreme Court "retired" the "no set of facts" formulation of the Rule 12(b)(6) standard and dismissed an antitrust-conspiracy complaint because it did not contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.*; *see Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 541-42 (6th Cir. 2007). Because the decision in this case was not based on the adequacy of the factual allegations, we need not resolve this uncertainty.

quarrel with the determination that California law governs, except where documents contain an express choice of law provision to the contrary,  because the Policy specified California law and California has the most substantial connection to the litigation.[5]

## B.     Suretyship

To affirm we must find that the transaction as a whole unambiguously established a suretyship with Chase/Citibank as the intended obligee.  Surety contracts are construed using the same rules that govern the interpretation of other contracts.  *Cates Constr., Inc. v. Talbot Partners*, 980 P.2d 407, 413 (Cal. 1999); *Superior Wholesale Elec. Co. v. Cameron*, 70 Cal. Rptr. 636, 638 (Cal. Ct. App. 1968).  The language of the contract governs if it is clear and does not result in an absurdity; and the intention of the parties is to be ascertained, if possible, from the writing alone.  *See* CAL. CIV. CODE §§ 1638 and 1639.  In discussing California law, this court explained that a policy is ambiguous if its terms are reasonably susceptible of more than one construction, and that extrinsic evidence is admissible if it is "'relevant to prove a meaning to which the language of the instrument is readily susceptible.'"  *Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 346-47 (6th Cir. 2005) (quoting *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968)); *see also Dore v. Arnold Worldwide, Inc.*, 139 P.3d 56, 60-61 (Cal. 2006) ("'When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is "reasonably susceptible" to the interpretation urged by the party.  If it is not, the case is over.'") (citation omitted).

Surety contracts and insurance contracts are conceptually and legally distinct.  *Airlines Reporting Corp. v. U.S. Fid. & Guar. Co.*, 37 Cal. Rptr. 2d 563, 567 (Cal. Ct. App.  1995).  The distinction, generally speaking, is that:

> An insurer undertakes to indemnify another "against loss, damage, or liability arising from an unknown or contingent event," whereas a surety promises to "answer for the debt, default, or miscarriage of another."  The surety relationship is a tripartite one; it is a third party (the obligee), not the principal, who is protected, although the principal pays the premium.  Furthermore, an insurer has no right of subrogation against its insured; a surety, on the other hand, is entitled to reimbursement by its principal.

*Id.*  (citation omitted.)  The fact that the Endorsement purports to be part of an insurance policy providing collateral security insurance coverage is not dispositive, as no particular form of agreement is required to establish a suretyship as long as the agreement establishes the intention to create a surety contract.  *Superior Wholesale*, 70 Cal. Rptr. at 639 (citing 46 Cal.Jur.2d, Suretyship and Guaranty, § 23).  It is the substance of the transaction, not the form, that controls.  *Id.*; *see also Cates Constr.*, 980 P.2d at 413 (holding bond and contract should be construed together); *Chem. Bank v. Meltzer*, 712 N.E.2d 656, 660 (N.Y. 1999) ("The existence of suretyship status depends upon the respective roles of the parties and the nature of the underlying transaction.").

The Restatement similarly provides that when the criteria for suretyship are fulfilled, the secondary obligor has surety status regardless of, among other things, the form of the transaction, the terms used to describe the secondary obligor or the secondary obligation, or whether the secondary obligation is conditional or unconditional.  RESTATEMENT (THIRD) OF SURETYSHIP AND GUAR. § 1(3); *see also Rhode Island Recr. Bldg. Auth. v. Indus. Nat'l Bank*, 494 A.2d 537 (R.I.

---

[5]Although not material to the outcome, the district court noted that the SSA provided for application of New York law except that questions of a true sale would be governed by Texas law.

1985) (affirming determination that agreement, although styled as an insurance contract, was a contract of suretyship). The Restatement also explains that a secondary obligor has the status of a surety when:

> (a) pursuant to contract (the "secondary obligation"), an obligee has recourse against a person (the "secondary obligor") . . . with respect to the obligation (the "underlying obligation") of another person (the "principal obligor") to that obligee; and
>
> (b) to the extent that the underlying obligation or the secondary obligation is performed the obligee is not entitled to performance of the other obligation; and
>
> (c) as between the principal obligor and the secondary obligor, it is the principal obligor who ought to perform the underlying obligation or bear the cost of performance.

RESTATEMENT (THIRD) OF SURETYSHIP AND GUAR. § 1(a) (1996). Suretyship is described as involving a tripartite relationship consisting of a principal obligee who is owed a debt or duty; a principal obligor who is responsible for payment of the debt or performance of the duty; and a secondary obligor or surety who agrees to answer for the primary obligor's debt or duty. *See Cruz-Mendez v. ISU/Ins. Servs.*, 722 A.2d 515, 521 (N.J. 1999).

## C.     Substance of Transaction

The district court concluded that the substance of the interrelated transactions was indistinguishable as a matter of law from the surety contracts issued by other insurance companies.[6] That is, the transactions taken together demonstrated that Chase/Citibank was the principal obligee with recourse against Illinois Union with respect to the underlying obligation of Lease Funding to Chase/Citibank.

The Endorsement, which named Lease Funding as the Insured and Chase as an Additional Insured/Loss Payee on behalf of the noteholders under the Indenture, provided the following "coverage":

> Coverage E:  LEASE COVERAGE – The Company will indemnify the Insured, its successors and assigns, for all Scheduled Payment Amounts on a Lease due on each Scheduled Due Date as set forth in the applicable Lease Agreement without deduction or set off of any kind, subject to the terms and conditions herein [as Paragraphs 1-15.]

This provision was followed by relevant definitions, including that "Scheduled Payment Amounts" meant the "amounts due on each Scheduled Due Date on each Lease as specified on the attached Schedule A." These are the payments due under the leases which were transferred by and to be serviced under the SSA and were pledged to secure the notes issued under the Indenture. "Date of Loss" was defined as "the first date on which any Scheduled Payment Amount on a Lease is

---

[6] An example of a typical Lease Bond provided in part: "That we, [], as principal, and [the surety company] . . . as Surety, are hereby firmly bound unto [CMC] as Obligee and its successors and assigns in the amount of [$__] . . . . The Obligee accepts the bond and [the surety company], as Surety, agrees to pay to the Obligee any amounts due and owing by the principal with regards to the lease . . . ." Under the Lease Bonds, which were issued for each individual lease, the lessee was the principal obligor, the insurer was the surety, and *CMC* was named as the obligee. The banks claimed to also be intended obligees, but the district court concluded that the contracts could not be reformed to contradict their express provisions on a motion for judgment on the pleadings.

contractually due but not paid . . . ." The conditions were negotiated and substituted for Illinois Union's standard conditions.

Of those conditions, the most important to the issues before us are found in paragraphs 1, 6, and 7, which provided in pertinent part as follows:

1.      The issuance of this Policy shall represent the Company's approval of the individual underwriting of each Lease (including the applicable lessee thereunder), **including but not limited to, all relating credit matters, issues of fraud, insolvency, bankruptcy and timely performance by the Insured,** any transferee of the Leases or any interest therein or by any servicer or sub-servicer designated by the Company, and the **Company shall assert no defenses** to any claim under the Policy as a result of any of the foregoing. **Coverage hereunder shall not be affected by** (i) a determination that the Lease is a secured financing or not a true Lease, is subject to usury, or is not valid, binding or enforceable, (ii) any financial difficulties, including bankruptcy, insolvency or similar proceedings, involving the Insured or any of the parties to the Sale and Servicing Agreement . . . , the Indenture . . . and the documents listed on Schedule B attached hereto (collectively the "Referenced Documents"), (iii) any failure by the Insured or any party to the Referenced Documents to comply with its obligations thereunder, . . . .

                . . . .

6.      **If** (a) the Insured fails to receive all or a portion of a Scheduled Payment Amount on the Scheduled Due Date as specified in Schedule A attached hereto, . . . **or** (b) any Scheduled Payment Amount previously made on a Scheduled Due Date or otherwise to any of [CMC], the Insured, or otherwise (x) is not paid over to and received by the Additional Insured/Loss Payee for any reason whatsoever or (y) is paid over to the Additional Insured/Loss Payee and is required to be rescinded, reclaimed, voided or recovered from the Additional Insured/Loss Payee for any reason, . . . then a default under the Lease with respect to the payment of such Scheduled Payment Amount shall be deemed to occur and the date of such occurrence of any such default shall be the applicable Date of Loss. . . .

7.      **The Company acknowledges that** [CMC] has sold the Leases to the Insured (and granted a back-up security interest therein to the Insured) and that **the Insured has pledged all of its rights hereunder with respect to the Leases to secure the obligations of the Insured under the Indenture** and that it is intended that such pledge shall constitute a first priority perfected security interest therein. **To give effect to the foregoing, the Company acknowledges that unless and until otherwise notified by the Trustee acting under the Indenture, the Company shall make all payments hereunder to the Trustee on behalf of the Additional Insured/Loss Payee and not the Insured** within thirty (30) days of receipt of written notice of a default of a Lease in accordance with its terms . . . . The Company agrees that all payments required to be made by it in respect of a Scheduled Payment Amount on a Lease shall be made notwithstanding (i) any transactions entered into by the Insured, [CMC], or any other person in connection therewith, including any transactions or purported transactions

> under the Sale and Servicing Agreement, the Indenture, or otherwise, and (ii) the involvement or noninvolvement of the Company in any matters contemplated by clause (i) above. . . .

(Emphasis added.)  Also, in paragraph 13, Illinois Union acknowledged, among other things, that it reviewed and had full knowledge of the transactions contemplated in the "Referenced Documents" (including the SSA, the Indenture, and the Policy), and that it did not rely on any communication (written or oral) from Lease Funding or Chase in deciding to issue the Policy and enter into any of the "Referenced Documents."

Insisting that the Endorsement provided nothing more than credit insurance, Illinois Union argues that it was error to find as a matter of law that the intended obligee was Chase and not Lease Funding because "default" is defined in terms of the underlying leases only.  We find, as did the district court, that the plain meaning of paragraph 1 refutes Illinois Union's argument that it undertook only to guarantee matters of credit and fraud on the part of the lessees because Illinois Union's approval of the underwriting for the leases specifically included "all relat[ed] . . . issues of fraud, insolvency, bankruptcy and timely performance by the Insured, any transferee of the Leases or any interest therein, or by any servicer or sub-servicer[.]"  This clearly extends beyond fraud on the part of the lessees.

Further, the Endorsement itself makes plain not only the interrelated nature of the transactions, but also the intention that Lease Funding would retain no right to payment under the Endorsement.  Paragraph 7 provides that in order to "give effect" to Lease Funding's pledge of the lease payments as security for the notes issued under the Indenture, Illinois Union would be required to make any and all payments under the Endorsement to Chase, on behalf of the noteholders, and not to Lease Funding.  We agree with the district court that Illinois Union undertook obligations beyond those of the lessees to make payment to Lease Funding by promising to answer for Lease Funding's obligations to Chase.  As will be discussed below, the district court later clarified that this principal obligation was Lease Funding's obligations under the SSA, although neither the district court nor Chase/Citibank have identified the provisions governing the extent of this obligation.

Illinois Union disputes this interpretation, arguing that Lease Funding remained a "genuine" insured with an insurable interest because it had a contingent right under the Indenture to receive any "excess" lease payments.  Specifically, sums collected or advanced under the terms of the SSA were to be deposited in an account from which Chase, as trustee, would distribute the payments pursuant to the priority set forth in § 8.3 of the Indenture.  After all disbursements were made, any remainder was to be remitted to Lease Funding.  Indeed, the proffers made in connection with the Chase/Citibank motion for final judgment showed that this contingent right may not have been purely hypothetical.  Apparently because interest rates were lower for later-issued notes, the aggregate of scheduled lease payments exceeded the principal and interest due under the Indenture by approximately $6 million.  Be that as it may, however, Lease Funding's contingent interest in the "excess" under the Indenture in no way contradicts the clear directive that Illinois Union's obligation was to make any and all payments to Chase unless or until Chase directed otherwise.  Nor does it undermine the district court's determination that Illinois Union's obligations were to Chase as an intended obligee.

This conclusion is further bolstered, as the district court observed, by Illinois Union's asserted right to indemnification.  While an insurer generally does not have a right of subrogation against its insured, a suretyship confers rights of recourse to the surety against the principal obligor. RESTATEMENT (THIRD) SURETYSHIP AND GUAR. § 18.  In fact, it is quite common for an indemnity agreement to be entered into between a principal obligor and the secondary obligor. *Id*. at comment b; *see also Airlines Reporting*, 37 Cal. Rptr. 2d at 567.  Illinois Union alleged that, as part of the

inducement to issue the various collateral security insurance policies, CMC and CMC-related entities and principals agreed in writing on more than one occasion to indemnify Illinois Union from any losses and claims under the policies. In response to the Chase/Citibank motion for judgment, Illinois Union argued that one of the indemnity agreements purported to exclude CMC's special purpose entities from the obligation to indemnify Illinois Union. While declining to revisit the issue of suretyship, the district court noted that this would not alter its conclusions because CMC, the sole owner of Lease Funding, had undisputedly agreed to indemnify Illinois Union. The absence of any dispute that Illinois Union secured indemnity agreements allowing recourse against CMC, its subsidiaries and its principals if called upon to pay under the Endorsement undermines the claim that this was a traditional insurer-insured relationship. [7]

Despite being written as insurance coverage, the terms of the negotiated Endorsement, examined in the context of the larger integrated transaction, established a surety relationship as a matter of law, with Illinois Union as the secondary obligor, Lease Funding as the principal obligor, and Chase as the intended obligee.

## D.     Fraud of the Principal

The finding of a suretyship is significant in this case because "[t]he rule is well settled and generally followed that fraud of the principal debtor will not relieve the guarantor or surety who acted at the request of the debtor from liability, if the creditor did not have notice of the fraud and did not participate therein." *Simon Newman Co. v. Tully*, 88 P.2d 131, 132 (Cal. 1939); 59 CAL. JUR. 3D SURETYSHIP & GUAR. § 75 ("It is also no defense to an action by the creditor that the principal committed fraud in securing the bond, unless the surety can establish that the creditor had notice of such fraud and participated in it."); *see also Am. Mfg. Mut. Ins. Co. v. Tison Hog Mkt., Inc.*, 182 F.3d 1284, 1288 (11th Cir. 1999) (explaining that under common law of suretyship, fraud or misrepresentation by the principal alone, without the knowledge or participation of the obligee, in inducing the surety to enter into a surety contract will not affect the liability of the surety). Here, Illinois Union has never claimed that Chase/Citibank either had notice of or participated in the alleged fraud. That being the case, Illinois Union was precluded from denying liability to Chase on the grounds of fraudulent inducement. In an effort to avoid this result, Illinois Union argues that the fraud may be imputed to Chase under agency principles, that policies induced by fraud are void, and that the express waiver of fraud defenses was ineffective.

### 1.     Agency

"Indicia of an agency relationship are the agent's power to alter legal relations between the principal and others, a fiduciary relationship, and the principal's right to control the agent's conduct." *Valley Inv., LP v. BancAmerica Commercial Corp.*, 106 Cal. Rptr. 2d 689, 698 (Cal. Ct. App. 2001). The district court found that Illinois Union failed to allege the necessary elements of either actual or ostensible authority, and Illinois Union has shown no error in this regard. While Illinois Union alleged that the Endorsement was required by Chase/Citibank as part of the transaction, there is no claim that CMC or Lease Funding was given authority to act for Chase/Citibank, or that Chase/Citibank acted in a manner that could lead Illinois Union to reasonably believe that CMC or Lease Funding was acting as an agent for Chase/Citibank.

Moreover, Illinois Union's reliance on insurance broker cases is misplaced. Specifically, in *Century Sur. Co. v. Crosby Ins., Inc.*, 21 Cal. Rptr. 3d 115, 120 (Cal. Ct. App. 2004), the court

---

[7]The written indemnity agreements contemplated that they would cover "any instrument of guarantee, whether in the form of a surety bond or insurance policy, or an endorsement to an insurance policy, including but not limited to any guaranty of lease payment obligations referred to as Collateral Security Endorsement."

recognized an insurer's remedy against an insurance broker for fraud where the broker was an agent of the insured. *Purcell v. Pac. Auto. Ins. Co.*, 64 P.2d 1114, 1115 (Cal. Ct. App. 1937) (insurance agent requesting insurance from a company he does not represent is acting for the insured). Neither CMC nor Lease Funding were brokers procuring insurance for an insured.

### 2.    Void for Fraud

Illinois Union also argues that California, like other jurisdictions, does not permit a waiver of fraud to be effective against a party whose own fraud induced the contract. *Danzig v. Jack Grynberg & Assocs.*, 208 Cal. Rptr. 336, 342 (Cal. Ct. App. 1984) ("'A party to a contract who has been guilty of fraud in its inducement cannot absolve himself from the effects of his fraud by any stipulation in the contract, either that no representations have been made, or that any right which might be grounded upon them is waived.'") (citation omitted). As the district court concluded, this principle is inapplicable here because Illinois Union does not seek rescission on the grounds of Chase/Citibank's "own" fraud.

Relying on California insurance law, Illinois Union argues that rescission for material misrepresentation voids the policy as to all insureds unless the policy provides to the contrary. *Admiral Ins. Co. v. Debber*, 442 F. Supp. 2d 958, 966 (E.D. Cal. 2006); *see also TIG Ins. Co. of Mich. v. Homestore, Inc.*, 40 Cal. Rptr. 3d 528, 533 (Cal. Ct. App. 2006) (holding insurer could rescind directors and officers liability policy against innocent insured). Because we have already concluded that the Endorsement created a surety contract, Illinois Union may not avoid liability to Chase/Citibank on account of misrepresentations by Lease Funding.

### 3.    Waiver of Defenses

The district court further found that Illinois Union had effectively waived the defenses it was asserting in its counterclaims. As outlined earlier, the Endorsement not only disavowed reliance on any oral or written representations by the Insured or Additional Insured, but also specifically waived the right to assert defenses "including but not limited to all relat[ed] credit matters, issues of fraud, insolvency, bankruptcy and timely performance by the Insured[.]" Illinois Union further agreed that its obligation to pay would not be affected by the validity or enforceability of the leases or the failure of Lease Funding to comply with its obligations under the SSA and the Indenture.

Illinois Union relies on two cases, neither of which applies California law, to argue that fraudulent inducement may not be waived absent a specific disclaimer of reliance on the particular misrepresentations. The argument for a specificity requirement is rooted in the *Plapinger* line of cases, including *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993) (discussing *Citibank, N.A. v. Plapinger*, 485 N.E.2d 974, 976 (N.Y. 1985)). In *Yanakas*, an "absolute and unconditional" guaranty in boilerplate language on a preprinted form was held not to waive a claim of fraudulent inducement. The waiver in *Plapinger* stated that the guaranty was "absolute and unconditional" irrespective of any lack of validity of the loan agreement or other circumstances that might constitute a defense. There, the waiver was upheld in part because the guaranty was not generalized boilerplate, but was the product of extended negotiations between sophisticated parties.

The Third Circuit rejected similar arguments in *MBIA Insurance Corp. v. Royal Indemnity Co.*, 426 F.3d 204, 214-16 (3d Cir. 2005), and distinguished *Yanakas* as less applicable when a sophisticated party is arguing that a negotiated waiver is too broad. The court concluded that the Delaware courts would enforce the waivers negotiated by sophisticated parties to bar a claim for

rescission on the grounds of fraud under circumstances noticeably similar to this case.[8]  The agreement in *MBIA* provided that the obligation to pay was "absolute and unconditional" without specifying that it included fraud or misrepresentation, and disclaimed reliance on any extracontractual representations.  The court in *MBIA* held that the scope of the insurer's obligation under the credit insurance policies "turn[ed] not on a boilerplate merger clause but on waivers sculpted by parties of exquisite legal and financial sophistication[.]" *Id.* at 215. This is equally true in this case, where the parties "sculpted" provisions that not only disclaimed reliance on any oral or written representations, but also specifically waived the right to assert defenses including all issues of fraud.

In the other case relied upon by Illinois Union, *JP Morgan Chase Bank v. Liberty Mut. Ins. Co.*, 189 F. Supp. 2d 24 (S.D.N.Y. 2002), the court held that the general waiver did not preclude the surety from avoiding payment on the grounds of fraud.  That decision was distinguished by the court in *MBIA* because *JP Morgan*, an "Enron" case, involved an extreme case of fraud that bordered on fraud in the factum.  426 F.3d at 217 ("[W]here the party does not even know the 'true nature' of what it is signing, it is unsurprising that the standards for effective waiver would be stricter, if waiver is possible at all.").  In contrast, the fraud at issue in *MBIA* did not call into question the nature of the transactions covered by the insurer's credit risk policies.  That is, despite allegations that the student loan business was a sham, it was a fairly obvious risk of issuing credit risk policies that the insured would misrepresent the validity and/or quality of the underlying loans.  Because the same is true in this case, we are not persuaded that *JP Morgan* would apply here.

For the foregoing reasons, we conclude that the district court did not err in finding that Chase/Citibank was entitled to judgment on the pleadings under Rule 12(c).

### III.

In its next claim of error, Illinois Union challenges the district court's award of damages on Chase/Citibank's motion for entry of final judgment.  Illinois Union argues first that it was error to award $46 million in damages based on a "conclusory two-page declaration."  Our review of the record reveals that although Illinois Union submitted evidence asking for reconsideration of the suretyship issue, Illinois Union did not dispute the calculations proffered in that declaration by Chase/Citibank.  Nor has Illinois Union made any showing that the calculations were inaccurate or based on incorrect information.  Rather, Illinois Union contends that the difference between the Scheduled Lease Payment Amounts and the sums received by Chase/Citibank was not a proper measure of its liability as a surety.  This is a question of contract interpretation and application of surety principles.

While the extent of a secondary obligation is generally determined from the surety contract, the obligations of a surety must not be greater than that of the principal. CAL. CIV. CODE § 2809 ("The obligation of a surety must neither be larger in amount nor in other respects more burdensome than that of the principal; and if in its terms it exceeds it, it is reducible in proportion to the principal obligation."); *U.S. Leasing Corp. v. DuPont*, 444 P.2d 65, 75 (Cal. 1968) ("since the liability of a surety is commensurate with that of the principal, where the principal is not liable on the obligation, neither is the guarantor").  It is also true, however, that "the effect of suretyship status may be varied

---

[8]There, student loans were originated, bundled, and sold to special purpose trusts against which banks lent money and sold shares in the trusts.  Insurers issued credit risk policies insuring either the bundled student loans or the loans held by the banks. The student loan originator allegedly misrepresented the risks associated with the student loans, participated in altering or forging of student loan documents, and masked defaults on the student loans by diverting proceeds of later loans.  Royal claimed that the student loan securitization business was a sham and sought to avoid its obligations on the grounds of fraudulent inducement.

by contract between the parties subject to it." RESTATEMENT (THIRD) OF SURETYSHIP AND GUAR. § 6. California law recognizes that a surety may waive its right to limit its liability to that of the principal. CAL. CIV. CODE § 2856(a)(1); *Bloom v. Bender*, 313 P.2d 568, 575 (Cal. 1957).

The district court rejected Illinois Union's contention that its obligation as a surety should be limited to the amounts due under the notes, finding that—despite the "inherent appeal" of the argument—the secondary obligor did not promise to answer for the obligation to pay under the notes. Rather, the district court concluded that the Endorsement defined the secondary obligation as a guaranty of all lease payments not received by the trustee irrespective of the principal obligation to Chase/Citibank. Particular emphasis was placed on the provision in paragraph 7 that all payments to be made with respect to a Scheduled Payment Amount shall be made notwithstanding "any transactions entered into by the Insured, [CMC], or any other person . . . , including any transactions or purported transactions under the [SSA], the Indenture, or otherwise[.]" Morever, even when the SSA and the Indenture were considered, the district court explained that

> the transaction documents grant[ed] Lease Funding only a tenuous interest—subordinate to the rights of virtually all other parties to the transaction—and that interest does not affect the duties imposed upon Illinois Union. Whether Chase as Trustee ultimately will be required to distribute some portion of its recovery to Lease Funding (or to other parties) is a question governed by the transaction documents, and it is of no concern to Illinois Union. Illinois Union's obligation, as set forth in the Policy, is to pay all Scheduled Payments due and unpaid to the Trustee.

We find that it was error to first construe the transaction documents together to find that a suretyship was created as a matter of law, but to then divorce that Endorsement from the other transaction documents to determine the extent of the surety's liability. In addition, given the structure of the transaction as a whole, the language in paragraph 7 cannot be read as a waiver of a surety's right to limit its liability to that of the principal.

To be sure, we agree that the Endorsement defines Illinois Union's obligations in terms of the Scheduled Lease Payment Amounts, and nothing in the Endorsement can be understood as a direct guaranty of the amounts due under the notes. Nonetheless, the notes were both secured by *and* to be repaid from the lease payments. The Endorsement, issued as an integral part of the larger transaction, expressly recognized the interrelationship between the SSA and the Indenture. In their simplest terms, the SSA and the Indenture operated together such that the lease payments would be collected under the terms of the SSA and transferred to Chase as trustee for distribution under the terms of the Indenture. In essence, the lease payments were also the note payments.

Moreover, as already discussed, the parties contemplated that if the lease payments collected exceeded the note payments (and other expenses), Lease Funding would be entitled to receive the remainder. While Lease Funding had no residual right to the proceeds from the Endorsement, Lease Funding's retention of the right to any "excess" under the Indenture is not extraneous to the issue before us. Rather, it completes the picture of the extent of Lease Funding's obligation to Chase, as trustee for Citibank, pursuant to the SSA and the Indenture. While Illinois Union participated in the SSA as both credit insurer and servicer, judgment was entered against Illinois Union as surety for Lease Funding's principal obligations to Chase as trustee for the noteholders.

Because we find that Illinois Union's liability as surety should not exceed the principal obligation due to Chase as the intended obligee, we reverse the award of damages and remand for further consideration consistent with this opinion.

**IV.**

We review the denial of a motion to amend for abuse of discretion, except to the extent that it is based on a legal determination that the amendment would not withstand a motion to dismiss. *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 459 (6th Cir. 2001). Leave to amend a pleading shall be freely given "when justice so requires." FED. R. CIV. P. 15(a). Factors that may affect that determination include undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendment, undue prejudice to the opposing party, and futility of the amendment. *Wade*, 259 F.3d at 458-59 (quoting *Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir. 1989)).

Illinois Union maintains that leave should have been granted to allow amendment of its counterclaims and answers with respect to Chase/Citibank to reflect evidence obtained in discovery. Except for its insistence that it relied on extensions of the deadlines for seeking leave to amend, Illinois Union offers no explanation for having waited until after resolution of the 12(c) motions to argue that the issue could not be decided without reference to extrinsic evidence concerning the subjective intentions of the individuals involved in negotiating the Endorsement. Although the deadlines for filing such a motion had not expired, the district court made clear that it viewed Illinois Union's request with respect to Chase/Citibank as nothing more than an attempt to reargue failed theories and get a new "bite at the apple." The district court explained that Illinois Union had plenty of time in which it could have moved to supplement the response to the motion for judgment on the pleadings, but instead persisted in arguing that the issue could be decided as a matter of law.

The district court then entered a stay of all proceedings to allow for mediation, but excepted the disputes between Illinois Union and Chase/Citibank. Upon Illinois Union's request for clarification, the district court reiterated that Illinois Union would not be permitted to seek leave to amend at that time and added that

> it would be grossly inequitable to Citibank to delay its pursuit of final judgment by permitting Illinois Union to seek to amend itself out from under the Court's August 19, 2005 ruling. This is especially true given that Illinois Union had more than ample opportunity to amend its pleadings before [the] Court issued an order in favor of Citibank, but chose not to do so.

In March 2006, as soon as the stay was lifted, Illinois Union filed a motion for leave to file its proposed amended pleadings against Chase/Citibank as well as others. The district court discussed but did not decide the motion to amend in the order granting the motion of Chase/Citibank for final judgment. While reserving the issues of prejudice and futility for a later time, the district judge took the opportunity to emphasize that the parties had been advised that motions to amend could be filed without derailing decision on the 12(c) motions and that the vast majority of matters raised by the proposed amendment had already been decided. In October 2006, after entry of judgment in favor of Chase/Citibank, Illinois Union's motion to amend was denied as moot with respect to claims involving Chase/Citibank.

First, there can be no question that the district court viewed Illinois Union's delay in seeking leave to amend as "undue delay" motivated by an attempt to reargue its failed theories and get a new "bite at the apple." Delay alone will ordinarily not justify the denial of leave to amend; however, delay will at some point become "undue," "placing an unwarranted burden on the court," or "prejudicial," "placing an unfair burden on the opposing party." *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002). Also, in the post-judgment context, "competing interests in finality of judgments and the expeditious termination of litigation" require that courts be mindful of not only

prejudice to the opposing party but also the reasons the movant failed to seek leave to amend earlier. *Id*. at 800; *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 698-99 (6th Cir. 2004).

The question of whether the Endorsement was an insurance policy or a surety contract was squarely presented by the 12(c) motions, but Illinois Union chose to rely on the pleadings to argue that it was clearly and unambiguously intended as an insurance contract. Illinois Union was not entitled to wait in the wings for an adverse decision before asserting that the issue should not have been determined from the documents alone. *Id*. at 699 (party not entitled to an advisory opinion and an opportunity to cure those deficiencies). The district court's assessment that it would be grossly inequitable to allow Illinois Union to amend itself out from under the judgment of liability certainly suggests its view that to allow amendment would place an unfair burden on the opposing party.

Moreover, even when a district court fails to articulate the basis for denying a motion to amend, the error may be harmless if the proposed amendment would be futile. *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 425 (6th Cir. 1999); *Moore v. City of Paducah*, 790 F.2d 557, 559 (6th Cir. 1986). Asserting that the amendment would not have been futile, Illinois Union argues that, under California law, extrinsic evidence is admissible if it is relevant to prove a meaning to which the language of the contract is reasonably susceptible. *Dore v. Arnold Worldwide, Inc.*, 139 P.3d 56, 60-61 (Cal. 2006). Without suggesting that the language was susceptible of more than one interpretation, Illinois Union argues that the absence of ambiguity cannot be determined without considering extrinsic evidence of the parties' intentions.

The extrinsic facts it proposed adding to its pleadings included evidence that the parties described and referred to the Endorsement as credit insurance, Citibank's attorney expected an insurance policy, Illinois Union's underwriter advised bank representatives that the endorsement was not a surety bond, and Citibank did not insist on "absolute and unconditional" language because Illinois Union would have "walked away from the deal." Such facts, while newly alleged, simply lend support to the claim that the parties subjectively understood the Endorsement to be an insurance policy as opposed to a surety contract. As the district court explained, the finding of a suretyship was based on the structure and substance of the transaction as a whole and not on the absence of any facts that could be established in discovery. It is the substance of the transaction, and not the form or terminology used, that controls. Because the proposed amendment would be futile, we affirm the denial of Illinois Union's motion to amend.

## V.

For the reasons set forth above, we **AFFIRM** the order granting the 12(c) motion in favor of Chase/Citibank and against Illinois Union with respect to liability, and **AFFIRM** the denial of Illinois Union's motion to amend its pleadings with respect to Chase/Citibank. Further, we **REVERSE** the award of damages and **REMAND** for further consideration consistent with this opinion.