### In re STERLING PHOENIX DEVELOPMENT VI, LLC, Debtor.

Sterling Phoenix Development VI, LLC and HRP Cincinnati, LLC, Plaintiffs

v.

Bartlett Acquisition, LLC and Robert J. Bobb, Defendants.

Bankruptcy No. 08–14686.
Adversary No. 08–1147.

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

May 19, 2009.

---

Robert A. Klingler, Lead Attorney, Douglas L. Lutz, Cincinnati, OH, for Plaintiffs.

Donald J. Rafferty, Cohen, Todd, Kite & Stanford, LLC, Cincinnati, OH, for Defendants.

## MEMORANDUM OF DECISION

JEFFERY P. HOPKINS, Bankruptcy Judge.

The Debtor, Sterling Phoenix Development VI, LLC ("Sterling"), owns a commercial building in Cincinnati known as the Bartlett Building. Among other things, the complaint seeks a determination of the priority of certain liens against the property.

Fifth Third Bank ("Fifth Third") holds a first mortgage, securing a debt of approximately $3,000,000. Who is next in line is the main issue presented. The two entities that claim the second position are: (1) Plaintiff HRP Cincinnati, LLC ("HRP"); and (2) Defendant Bartlett Acquisition, LLC ("Bartlett"). Presently before the Court are cross-motions for summary

judgment filed by HRP and the Defendants. See Docs. 22 & 25.

Many priority disputes involve issues of perfection or avoidance. Not this proceeding. This dispute is based upon the effect of a release executed by Defendant Robert J. Bobb.

### THE BUSINESS OPPORTUNITY

The story begins in late 2005, when John Thomas presented a business opportunity to Mr. Bobb. Mr. Thomas told Mr. Bobb about the Bartlett Building, identifying it as a good investment. After some due diligence, Mr. Bobb agreed to pursue the opportunity. Mr. Bobb would make a capital contribution of $310,000 and Mr. Thomas would manage the property.

### THE LEGALESE

Certain business entities were used to facilitate the deal.

Sterling was used to purchase the building. The sole member of Sterling was Bartlett Building Property, LLC ("BBP"). The sole member of BBP was Mr. Bobb.

The property was to be managed by Morgan Street Management, LLC ("MSM"). John Thomas was the managing member of MSM.

### THE BARTLETT BUILDING PURCHASE

Sterling purchased the building in March of 2006. Fifth Third financed the purchase and obtained a first mortgage. The mortgage secured: (1) a $5,510,000 Draw Note; and (2) a Reimbursement Agreement, pursuant to which Fifth Third established a $2,956,809 letter of credit for Sterling. Fifth Third also obtained a $4,000,000 guaranty from Mr. Bobb.

### THE SUSPICION OF MISCONDUCT

Shortly after the purchase, Mr. Bobb became concerned about Mr. Thomas' management of the building. Mr. Bobb had an accountant investigate. The accountant discovered that Mr. Thomas was using revenues generated from the building rents to pay for personal expenses.

### THE BUYOUT

Based upon the discovery, Mr. Bobb insisted that Mr. Thomas buy him out. Consequently, on September 21, 2006, Reena Bartlett, LLC ("RB") and Morgan Street Ventures II, LLC ("MSV"), of which Mr. Thomas was the managing member, acquired BBP's membership interest in Sterling. BBP or Mr. Bobb received $1,150,000 from the transaction.

Plaintiff HRP financed the buyout. HRP advanced $2,530,000 to facilitate the transaction. As security, HRP took a second mortgage on the Bartlett Building.

### THE RELEASE

As a condition to the HRP loan, HRP insisted that Mr. Bobb execute a release in favor of Sterling, among others. The release, executed on September 21, 2006, provides in material part:

> Bobb hereby releases and forever discharges [Sterling] from any and all claims ... known or unknown ... which Bobb may now or hereafter have against [Sterling] in connection with the Bartlett Transaction ... [and] any matters relating or incidental thereto[.]
>
> Bobb agrees not to participate in any matter or in any future proceedings relating in any way to the matters referred to above.
>
> [T]he foregoing shall not affect, and Bobb hereby specifically reserves, any rights which Bobb may have against [Sterling] with respect to Bobb's guarantee of the Fifth Third loan[.]

The release is governed by Illinois law.

### THE ASSIGNMENT OF THE DRAW NOTE

Sterling defaulted under Fifth Third's Draw Note. Fifth Third looked to Mr. Bobb and his guaranty. Instead of paying on the guaranty, Mr. Bobb indirectly pur-

chased the Draw Note from Fifth Third. Fifth Third's rights under the Draw Note and guaranty were purchased by Defendant Bartlett on March 31, 2008, for approximately $5,000,000. Mr. Bobb is the sole member of Bartlett.

As part of the transaction, Bartlett also obtained a partial subordinate interest in Fifth Third's first mortgage. Thus, Mr. Bobb was no longer Sterling's guarantor. Instead, through Bartlett, Mr. Bobb was Sterling's secured creditor.

### THE STIPULATION

For purposes of this proceeding, Bartlett and Mr. Bobb have stipulated that Bartlett is bound by the release "on the same basis as is" Mr. Bobb. See Doc. 11.

### THE THRESHOLD ISSUES

The threshold issues presented are whether: (1) the release precludes Bartlett's enforcement of the Draw Note; and (2) Mr. Bobb and Bartlett breached the release.

### THE ANALYSIS

I. The Release Does Not Preclude Bartlett's Enforcement of the Draw Note

Bartlett, through Mr. Bobb, did not release its rights under the Draw Note because: (1) under Illinois law, one cannot release future claims; and (2) Bartlett did not obtain any rights under the Draw Note until sometime after Mr. Bobb executed the release.

■ The Supreme Court of Illinois has addressed the effect of a release on rights that do not arise until sometime after the execution of the release:

It is clear that a contractual release cannot be construed to include claims not within the contemplation of the parties, and it will not be extended to cover claims that may arise in the future. Indeed, "a release covering all claims that might later arise between the parties 'would constitute a consent to the foregoing of legal protection for the future and would plainly be against public policy.' "

*Feltmeier v. Feltmeier,* 207 Ill.2d 263, 278 Ill.Dec. 228, 798 N.E.2d 75, 89–90 (Ill.2003) (citations omitted). The result is no different even if the future rights could have been anticipated at the time of the release. *Id.*[1]

■ When Mr. Bobb executed the release on September 21, 2006, neither he or Bartlett possessed any rights under the Draw Note. Bartlett did not acquire rights under the Draw Note until March 31, 2008. Even HRP concedes that "the rights Bobb has sought to enforce were acquired when he purchased the [Draw Note] in 2008— long after he executed the Release in September 2006." See Doc. 22 at 12. Consequently, pursuant to *Feltmeier,* the release does not apply to Bartlett's rights under the Draw Note. *Accord Harris v. Walker,* 119 Ill.2d 542, 116 Ill.Dec. 702, 519 N.E.2d 917, 919 (Ill.1988) (releases are not favored and must be strictly construed against the benefitting party); *Scott & Fetzer Co. v. Montgomery Ward & Co.,* 112 Ill.2d 378, 98 Ill.Dec. 1, 493 N.E.2d 1022, 1029 (Ill. 1986) (same); *Fuller Family Holdings, LLC v. Northern Trust Co.,* 371 Ill.App.3d 605, 309 Ill.Dec. 111, 863 N.E.2d 743, 753 (Ill.Ct.App.2007) (same).

1. *Feltmeier* addressed the issue of whether a former wife released a future tort claim against her former husband in their separation agreement. The future claim of intentional infliction of emotional distress was based, in large part, on conduct that occurred prior to the execution of the release. Notwithstanding, the court held that the future claim was not released because it did not accrue until sometime after the execution of the release.

## II. Neither Mr. Bobb nor Bartlett Breached the Release

■ HRP argues that the Defendants breached the release by seeking to enforce the Draw Note. Because the release did not apply to Bartlett's future rights under the Draw Note, there has been no breach of the release by Bartlett or Mr. Bobb.

### THE ALTERNATIVE ISSUES

■ Alternatively, HRP presents two issues: (1) whether Bartlett's lien should be equitably subordinated to HRP's lien; and (2) whether the Bartlett claim should be reduced by amounts it paid for the Draw Note.

### I. Equitable Subordination [2]

HRP claims that Bartlett's lien should be subordinated to HRP's lien, pursuant to 11 U.S.C. § 510(c), based upon inequitable conduct. HRP contends that Mr. Bobb engaged in inequitable conduct by failing to inform HRP of Mr. Thomas' misconduct prior to the close of the HRP loan.

■ HRP argues that Mr. Bobb is an "insider." Insider transactions are subject to greater scrutiny under § 510(c)—not because they are inherently wrong, but simply because there is greater opportunity to control the debtor. *In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 745 (6th Cir. 2001). However, even if an insider is involved, equitable subordination is an unusual remedy to be applied with great caution in limited circumstances. *Id.*

■ The Sixth Circuit has adopted a three-part test under § 510(c). *See AutoStyle Plastics,* 269 F.3d at 744. Even if all three elements are established, equitable subordination is permissive, not mandatory. *Id.*

### A. Inequitable Conduct

■ First, the creditor to be subordinated must have engaged in inequitable conduct. *Id.* Inequitable conduct is conduct that, though it may be legal, "shocks one's good conscience." *In re Adelphia Communications Corp.,* 365 B.R. 24, 68 (Bankr.S.D.N.Y.2007). It includes enrichment through "unconscionable, unjust, unfair, close or double dealing or foul conduct." *Id.*

---

**2.** HRP recently filed a motion to amend the complaint to add a count for equitable subordination. See Doc. 24. The Defendants object. See Doc. 30. Acknowledging the general rule that leave should be freely given, the Defendants argue that an exception applies because of undue prejudice and delay.

"Delay alone will ordinarily not justify the denial of leave to amend; however, delay will at some point become 'undue,' 'placing an unwarranted burden on the court,' or 'prejudicial,' 'placing an unfair burden on the opposing party.'" *Commercial Money Center, Inc. v. Illinois Union Ins. Co.,* 508 F.3d 327, 347 (6th Cir.2007) (citations omitted). The Court does not believe the delay in this case to be undue or prejudicial. The motion to amend was filed on March 30, 2009, prior to the April 3, 2009 deadline for completing discovery. See Doc. 18.

The Defendants argue that the new claim is prejudicial because they have not conducted discovery or fully briefed summary judgment with respect to the issue of equitable subordination. HRP's summary judgment motion discloses the fact that HRP contemporaneously filed the motion to amend and sought summary judgment on the equitable subordination issue. See Doc. 22 at n. 7. The Defendants did not object at that time. To the contrary, the Defendants elected to brief HRP's summary judgment motion without the benefit of further discovery.

Because the general rule that leave should be freely given does not appear to be outweighed by the exception for delay and prejudice, the motion to amend will be **GRANTED** by separate order. However, to avoid any prejudice, the Defendants will be granted leave to reopen discovery concerning the new claim, if needed. Given the Court's ruling in this memorandum, the Court would only anticipate such a request within the context of post-judgment proceedings, if ever.

▬ Hazel Ravine Partners ("Hazel") is the managing member of HRP. Hazel created HRP to consummate the HRP loan. Hazel is in the business of providing short-term capital. Hazel's loans may involve risk characteristics that are not typical in loans from commercial banks. For example, they may involve a quick closing or the borrower may have some quirk.

William J. Abrams is a partner at Hazel and the primary contact on the HRP loan. HRP's involvement began when Mr. Thomas, not Mr. Bobb, contacted Mr. Abrams in the spring of 2006. Mr. Abrams never met Mr. Bobb until sometime after the closing of the loan.

Mr. Abrams knew: (1) the loan proceeds would be used, in part, to buy out Mr. Bobb; (2) Mr. Thomas was a convicted felon whose real name was Bernard Barton; (3) Mr. Thomas wanted the money "mighty quickly," according to Mr. Abrams; and (4) the HRP loan would constitute an event of default under the Fifth Third loan. Hazel did not contact Fifth Third to obtain consent, being told by Mr. Thomas that Fifth Third would not likely approve the transaction in the time frame that Mr. Thomas needed the funds. Mr. Abrams decided that Hazel would take the risk.

The risks were addressed by the terms of the loan. For example, the note contained: (1) a base interest rate of 25%; (2) an annual default rate of 120%; and (3) a 15% origination fee. These rates were on the high end of Hazel's customary rates. Moreover, the transaction granted HRP a 5% interest in Sterling. In the words of Mr. Abrams: "John Thomas was a felon, and our pricing reflected the fact that he was a felon."

As part of its due diligence, Hazel reviewed: (1) the Bartlett Building and its market; (2) the financial statements for the building; and (3) the obligations secured by the building. Hazel did not verify the financials by examining the general ledger or other lower level financial data. Nor did Hazel do any due diligence to determine if Mr. Thomas was misappropriating funds.

Upon careful scrutiny of the circumstances surrounding the HRP loan, the Court does not believe that Mr. Bobb engaged in inequitable conduct.

▬ Mr. Bobb had no legal obligation to disclose anything to HRP. Under Illinois law, there is a duty to disclose if: (1) there is a fiduciary relationship; or (2) the plaintiff places trust and confidence in the defendant in such a way that the defendant possesses a position of influence and superiority over the plaintiff. *See Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 593 (Ill. 1997). There was no fiduciary relationship between HRP and the Defendants. Nor was there a relationship of trust and confidence prior to the HRP loan. In fact, Mr. Abrams admitted that there was no relationship at all. He never met Mr. Bobb until sometime after the HRP loan closed.

Although inequitable conduct may exist in the absence of legal wrongdoing, the Court does not believe that this record represents ⋅ the limited circumstances where the unusual remedy of equitable subordination should be applied.

First, it was Mr. Thomas, not Mr. Bobb, who took advantage of HRP. Mr. Bobb merely demanded that Mr. Thomas buy BBP's interest in Sterling. There is no evidence that Mr. Bobb told Mr. Thomas to seek the assistance of HRP or anyone else. Again, Mr. Bobb did not even know Mr. Abrams at that time.

▬ When scrutinizing the conduct of an insider under § 510(c), the issue is whether the insider actually used its power

to control the debtor to its own advantage or to another creditor's disadvantage. *AutoStyle Plastics,* 269 F.3d at 745. There is no evidence that Mr. Bobb controlled Sterling in any manner with respect to the HRP loan.[3]

Additionally, HRP was not naive about Mr. Thomas. Mr. Abrams knew he was a convicted felon who wanted money quickly to buy out Mr. Bobb. Mr. Abrams knew there were significant risks to the transaction and structured the transaction to price that risk.

Lastly, HRP knowingly chose to proceed with a significant risk without conducting a more careful review of the situation. Although hindsight is 20/20, one might think that greater due diligence is warranted when knowingly funding a convicted felon's fast-track buyout of an investor.

## II. Reduction of Bartlett Claim By Amounts It Paid for Draw Note

HRP also contends that Sterling's obligation under the Draw Note should be reduced by the funds paid by Bartlett to purchase the Draw Note. According to HRP, the payment should be treated as though it was a payment on Mr. Bobb's guaranty.

The Court disagrees. First, HRP cites no authority for this proposition. Second, the record reflects that Mr. Bobb purchased the Draw Note in lieu of paying under his guaranty. Exhibit A to the assignment from Fifth Third to Bartlett provides an itemization of the purchase price. The itemization does not reflect payment on the $4,000,000 guaranty. To the contrary, it reflects the purchase of the Draw Note with a principal balance of $4,848,697.06. Similarly, Mr. Abrams testified as follows: "[I]t looks to me like Bob bought the note. It doesn't look to me like he acted under the guaranty." Lastly, although the guaranty was released as part of the transaction, Mr. Bobb had to execute two additional guaranties to secure payment of two notes given by Bartlett to Fifth Third to purchase the Draw Note.

### *The Conclusion*

For the foregoing reasons: (1) HRP's motion to amend (Doc. 24) will be **GRANTED**; (2) HRP's summary judgment motion (Doc. 22) will be **DENIED**; and (3) the Defendants' summary judgment motion (Doc. 25) will be **GRANTED**. An order to this effect will be entered.

**IT IS SO ORDERED.**

---

**3.** Although Sterling is identified as the borrower under the HRP loan, there is no evidence in the record to suggest that Mr. Bobb caused Sterling to take any steps to obtain the loan. As noted already, contemporaneous to the closing of the HRP loan, BBP transferred its interest in Sterling to MSV (controlled by Mr. Thomas) and RB. Therefore, the Sterling identified in the HRP note is the Sterling controlled by MSV and Mr. Thomas, not the Sterling controlled by BBP and Mr. Bobb. For this reason, the Court has significant reservations as to whether Mr. Bobb is an "insider" for purposes of the transaction. Even if he is, however, equitable subordination is not warranted.