IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 15, 2021 Session

# OLD HICKORY COACHES, LLC v. STAR COACH RENTALS, INC., ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 16-930-IV      Russell T. Perkins, Chancellor**

_____

**No. M2020-00941-COA-R3-CV**
_____

This appeal involves the enforcement of a revenue-sharing agreement between two companies, in which one party supplied trailers and trucks and the other party leased the trailers and trucks to television and film production companies in the New York City area. Following a bench trial, the trial court entered its memorandum and order finding that the leasing company owed the supplying company $101,529.00 in rental income and the supplying company owed the leasing company $12,415.00 for major repairs and renovations. Additionally, the trial court denied the supplying company's motion to alter or amend the judgment of the trial court to hold the owner of the leasing company individually liable for the breach of contract. The supplier appeals. We affirm.

**Tenn. R. App. R. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and ARNOLD B. GOLDIN, JJ., joined.

Stephen C. Knight and Nader Baydoun, Brentwood, Tennessee, for the appellant, Old Hickory Coaches, LLC.

Davis F. Griffin and Cynthia A. Sherwood, Nashville, Tennessee, for the appellees, Star Coach Rentals, Inc., and James Copeland.

## OPINION

### I.      FACTS & PROCEDURAL HISTORY

In 2000, the principals of Old Hickory Coaches, LLC ("Old Hickory") and Star

Coach Rentals, Inc. ("Star Coach") agreed to a revenue-sharing agreement by a "handshake deal." Old Hickory was in the business of converting buses and trailers to meet the needs of individual actors such as Nicholas Cage and Don Johnson. Sherry Wise was the manager and an owner of Old Hickory.[1] Star Coach was in the business of leasing trailers and trucks to television and film production companies in the New York City area. James Copeland was the owner of Star Coach, as well as its President and CEO. In this revenue-sharing agreement between these two parties, Old Hickory would provide trailers and trucks that would be leased by Star Coach to television and film production companies in the New York City area. The parties agreed to the following terms: (1) Old Hickory would provide the trailers and trucks; (2) Star Coach would lease the trailers and trucks to production companies; (3) the parties would split the rental income 50/50; (4) Star Coach would be responsible for routine maintenance and storage; and (5) Old Hickory would be responsible for major repairs and renovations. As a result of this revenue-sharing agreement, the trailers and trucks were leased to shows like The Sopranos, Sex and the City, and all three Law & Order shows. For a majority of the parties' time working together, Star Coach leased the trailers and trucks to the production company for the television show Law & Order: Special Victims Unit. For approximately a decade, the parties performed under this agreement with no issues, but disagreements eventually arose between the parties, which led to this lawsuit. Throughout the pendency of this lawsuit, the parties offered conflicting testimony as to what exactly happened. These are their stories.

Originally in 2000, Old Hickory sent up to six trailers and six trucks to be leased by Star Coach to production companies, as well as two Winnebagos and one camera truck. The six trailers were 2000 Play-Mor trailers and the six trucks were Chevrolet two-wheel drive, 3500 trucks. Mr. Copeland explained the trailer-truck unit as follows:

> They were called two-actor trailers, meaning they were approximately 35 feet in length and they were separated in the middle, so there w[ere] two entrance doors. And there were mirrored rooms, so that — each room would have a bathroom, each room would have a dressing table, each room would have a couch, and each room, I believe at the time, had a reclining chair. And they were pulled by a Chevy two-wheel drive, 3500 truck.

Throughout the parties' business relationship, the leasing price ranged from around $1,200 to $1,500 per trailer per week and $1,000 per truck per week.[2] The rates were subject to

---

[1] Ronald Wise, Ms. Wise's husband, was the other member of Old Hickory. Mr. Wise testified that his role in the business was as follows:

> Sherry would consult me with our leasing contracts, the state of our equipment, whether we need[ed] to purchase new equipment. So I was involved in those decision-makings as far as income or potential-making income and — but I was not the face of the company, per se. Sherry dealt with dealing with our customers.

[2] The weekly rates for each year are as follows: (1) $1,200 per trailer and $1,000 per truck in 2008;

change from year to year, but the rates were fixed within each season once the trailers and trucks were leased to a production company. Although Old Hickory initially provided Star Coach with six trailers and six trucks, Mr. Copeland stated that they were only used in whole from 2000 to 2007.

In 2007, a production company informed Mr. Copeland that it wanted new trailers and trucks in order to renew its contract with Star Coach. As a result, Mr. Copeland contacted Ms. Wise and the two of them visited a Play-Mor trailer manufacturer in Missouri to look at purchasing two new 2008 trailers. The original six trailers were not used again once they were replaced with the two new trailers. Although Ms. Wise ordered the two trailers to be made and delivered to Star Coach, Old Hickory did not provide new trucks. The parties' testimony about the need for new trucks was conflicting.

Ms. Wise testified that the parties did not discuss having to get new trucks for the trailers. Ms. Wise denied any discussion of having to get new trucks, which is shown in her testimony as follows:

Q: Did y'all discuss having to get trucks?
A: No.
Q: You didn't discuss having to get new trucks for the trailers?
A: No.

Mr. Copeland testified in his deposition that Old Hickory's existing trucks would not adequately pull the new trailers because the new trailers were bigger and heavier. As Mr. Copeland explained it, the existing trucks were "light-duty" and the new trailers were "heavy-duty." According to Mr. Copeland, because the existing trucks weighed 16,000 pounds, a new 16,000-pound trailer attached to the hitch of one of these trucks would tend to lift the truck's front wheels off the ground. However, Ms. Wise testified in her deposition that her trucks could have adequately pulled the trailers, that her trucks were rated by General Motors to pull her trailers, and that she currently used her trucks to pull the trailers.

According to Mr. Copeland, since the production company insisted on new trucks in addition to the new trailers, he determined that he needed to buy new trucks if he wanted to continue the contract with the production company. Mr. Copeland testified that he was able to use a 2005 Chevy GMC 4500 crew cab already in his possession, but believing he

_____

(2) $1,200 per trailer and $1,000 per truck in 2009 (the invoice shows $2,200 which represents the total price for the trailer-truck unit); (3) $1,300 per trailer and $1,000 per truck in 2010; (4) $1,415 per trailer and $1,000 per truck in 2011 (the invoice shows $2,415 which represents the total price for the trailer-truck unit); (5) $1,415 per trailer and $1,000 per truck in 2012 (the invoice shows $2,415 which represents the total price for the trailer-truck unit); (6) $1,294.25 per trailer and $1,000 per truck in 2013 (the invoice shows $2,294.25 which represents the total price for the trailer-truck unit); (7) $1,294.25 per trailer and $1,000 per truck in 2014; and (8) $1,294.25 per trailer and $1,000 per truck in 2015.

had no other option, he purchased a 2008 Ford F450 king cab for $62,000. Consequently, Old Hickory's existing trucks were not being used. Mr. Copeland testified that the parties had a conversation about the new trucks:

> [Ms. Wise], I believe she ordered the trailers to be made and delivered to my garage. And I said, you know, they wanted new trucks as well, and she said, you know, we've got to see about that. And the trailers came. The guys dropped the trailers off and took off with the trucks. I said, what about the trucks? The previous trucks, . . . [the production company] was complaining about, and that's why they wanted new trucks.

According to Mr. Copeland, Old Hickory did not provide the new trucks because Ms. Wise could not afford them at that particular point in time. However, Ms. Wise testified that Mr. Copeland never told her that he was leasing out his trucks along with her new trailers, that she was not aware that her trucks were not working, and that she would have bought the trucks he needed. Ms. Wise stated Mr. Copeland "[n]ever asked me, because I would have gladly supplied the two trucks. I would have sold the six and bought the two to keep that contract, because the six trailers weren't working." Again, Ms. Wise reiterated that "he never asked me to buy trucks. I would have been stupid not to." She agreed that she was overpaid if her existing trucks were not being used, but maintained that she was never asked to supply two new trucks and did not know her existing trucks were not being used.

In 2010, Ms. Wise became aware that Star Coach failed to make eleven weeks of revenue-sharing payments to Old Hickory and informed Mr. Copeland about what she believed to be missed payments. Ms. Wise also began to suspect that Mr. Copeland was leasing her trailers for daily use without compensating Old Hickory for its share of the profits. Ms. Wise explained that her suspicion arose from finding scripts and itineraries in the drawers of her trailers from other television shows and Central Park jobs. Although the parties' testimony again conflicts, Ms. Wise testified that Mr. Copeland agreed to pay Old Hickory for the missing payments, but initially the parties did not reach an agreement as to how he would catch up. Ms. Wise had two email addresses which she believed that Star Coach used for business purposes. In October 2010, she emailed Star Coach using one of those addresses regarding her 2010 receivables and included a breakdown of each missed payment. After receiving no response, she emailed Star Coach in May 2011 using the other address. She also sent a letter to Star Coach in June 2011. In the letter, Ms. Wise wrote in part the following:

> The attached are my receivables records for Starcoach[] . . . . There are many other productions that my equipment was used on. Will you please reconcile it with your records? I am getting very concerned about the amount owed to me and the very length of time that we are getting into to get payment for.
>
> I have been very, very patient. The deal was 50 percent to Starcoach and 50

percent to [Old Hickory.]

As shown in this letter, Ms. Wise stated that the revenue-sharing agreement was between Star Coach and Old Hickory only.[3]  As for the emails mentioned above, Mr. Copeland testified that neither of the addresses used by Ms. Wise were correct. Sometime in 2011, according to Ms. Wise, the parties purportedly agreed to split the income 75/25 until Star Coach could pay off what was allegedly owed to Old Hickory from the 2010 missed payments.  Ms. Wise stated that Mr. Copeland told her, during a telephone conversation, that he was going to pay her and he knew he missed the payments.  Ms. Wise testified that after the parties made this purported agreement, Mr. Copeland instead took seventy-five percent for himself and gave twenty-five percent to her.

Mr. Copeland offered a very different explanation for this period of nonpayment in 2010 and then a subsequent period of reduced payment.  Mr. Copeland explained that Star Coach made "renovations" to the trailers in 2010, which included upgrading the televisions and putting in new carpet, fixtures, and furniture.  These renovations were mandated by the production company in order for the trailers to continue to be used.  Furthermore, the trailers needed to be updated to comply with New York City's Department of Transportation regulations.  In addition to these renovations, Star Coach replaced the generators in the two trailers.  This process involved bringing the new generator to the trailer, getting the tools necessary for the replacement, disconnecting the necessary parts, physically removing the old generator, installing the new generator, and reconnecting the necessary parts.  Moreover, the old generator had to be brought to a repair shop for overhaul and the new generator had to be tested to ensure it was satisfactory.  Star Coach also replaced batteries, springs, and shackles in the trailers.  A production company also had a locksmith install combination locks on the trailers and billed Star Coach for the parts and labor.

As explained before, major repairs and renovations were the responsibility of Old Hickory, while maintenance was the responsibility of Star Coach. Mr. Copeland testified that he informed Ms. Wise of the work he performed and she did not have the money to pay for it, so he felt like he had to take the money out of the income that was owed to her.  However, Mr. Copeland testified that Ms. Wise begged him not to do this because she was having some financial difficulties.  Ms. Wise testified that Mr. Copeland never informed her of these renovations and she did not remember a conversation between the two of them about refurbishing the trailers.  Although Ms. Wise did admit that she eventually learned that some of these renovations took place, which she explained in her testimony as follows:

A:  Like I said a while ago, he modified one room, took it from just a sitting

---

[3] Despite Ms. Wise's statement here, Old Hickory later filed a motion to alter or amend the judgment of the trial court claiming that Mr. Copeland was an individual defendant in the underlying case and also a party to the alleged contract in his individual capacity.

area to put a desk in it.
Q: Okay.
A: And then I'm sure he replaced carpet.
Q: And that's all?
A: And then when he upgraded a couple of TVs, all he did was just where the TV was inserted, the smaller ones, he just put a panel over it and mounted a bigger TV.

After some time had passed, according to Mr. Copeland, he made the decision to start withholding payments for several weeks to recuperate the money. Mr. Copeland testified that this amount that he withheld from Ms. Wise did not fully reimburse him for the major repairs and renovations to the trailers. However, Mr. Copeland believed the issue was resolved after discussing the situation with Ms. Wise and withholding payments to Old Hickory for eleven weeks.

Mr. Copeland testified that it was around this time when he realized that Ms. Wise was being paid for both trailers and trucks when she was only providing the trailers. Mr. Copeland believed that Old Hickory should have received money only for the trailers, and not the trucks, because that was all that was provided by Old Hickory after 2007. Mr. Copeland explained that the overpayment from 2007 to the end of 2010 was an oversight on his part. Therefore, Mr. Copeland reduced Old Hickory's payment from $1000 to $750 per week to correct this overpayment. Despite maintaining that this reduced payment was still more than Ms. Wise was entitled to, Mr. Copeland continued to pay her $750 per week because she insisted that she needed the money and he wanted to help her out. He testified that "[y]es, I did overpay them. I continued to pay her [$]750, and she was not entitled to [$]750." Mr. Copeland believed that Ms. Wise was not entitled to $750 "[b]ecause she was only entitled to 50 percent of the trailer rental. Whatever the trailer rented for, she was entitled to 50 percent, and I don't believe at any time that it was ever rented for $1,500, which would be — half would be [$]750." Ms. Wise testified that Mr. Copeland first informed her of this overpayment in 2011.

After 2010, Mr. Copeland continued to make what he characterized as major repairs and renovations to the trailers. Mr. Copeland replaced batteries, tires, tongue jacks, and a fuel tank. Mr. Copeland also had to manually move a slide[4] back in on one of the trailers. After moving the slide back, Mr. Copeland discovered the drive motor was burnt and needed to be replaced. Mr. Copeland testified that he was not reimbursed for this work that occurred after 2010. Unlike the 2010 major repairs and renovations, Mr. Copeland explained that he did not attempt to reimburse himself for this work for the following reason:

---

[4] The 2007 Play-Mor trailers were double-slide trailers, in which each room had a portion of it where an electric motor would slide out and extend the overall dimensions of the room to add cabin space.

I can't really answer that. I don't — outside of that, I felt sorry. I felt bad for her. We were, you know, friendly people. We worked together. As far as I was concerned, the amount in 2010 was resolved, and I wasn't in any dire need of the money that I made out.

In all, Mr. Copeland estimated the total cost of these major repairs and renovations from 2010 to 2013 was $42,965.00.

In the spring or summer of 2015, the business relationship between the parties ended after Mr. Copeland determined Star Coach could not continue to provide new trailers and trucks for production companies. Mr. Copeland added the following:

I decided that I was 72 years old and that enough aggravation and hardship was done, that I was going to downsize my business. I was not going to deal with trailers any longer, and I didn't want to spend my weekends underneath trailers repairing them, and that I was going to end my relationship with trailer rental to [the production company].

In August or September of 2015, Ms. Wise came and picked up the trailers. Ms. Wise continued to email Mr. Copeland about her 2010 receivables that she argued Old Hickory was never paid. Two emails were sent to a personal email address for Mr. Copeland and two were sent to one of the email addresses she had previously used for Star Coach. In February 2015, Ms. Wise emailed Star Coach stating that:

With the assumption that this is the last season for [Law & Order] SVU, I would like to settle up with you.

First of all, a few years ago I called you and requested 75% of the rental to recap the half season of 2010 that I did not get paid for. You said okay. I do not know where the communication went wrong but you assumed that I meant 75% for you. Of course, in no way would I have, out of the blue, meant 75% for Starcoach, and surely it occurred to you that I wouldn't have meant that. Many times I tried to correct the misunderstanding but with no luck. Presently I am suffering financially. Many of my older trailers are now at the point of expensive repairs . . . and updating them to keep them competitive. I also have the camera truck that you asked me to build that rarely works. I never came close to breaking even on it.

As for as [sic] the new accommodations, I do not know why I am being hit with these extra charges. Why wouldn't that be absorbed in Starcoach's fees. I don't understand why going from a[n] indoor warehouse to a[n] outside yard would cause more expense on me. From the very beginning that expense was covered by the rep fees.

Jim, I need my original 50% of the income, especially to help me recoup the 2010 income I did not receive. I will forward the income sheet that I gave you in the past tomorrow. I will, however, agree to help with the storage fee only if I receive the original 50%.

I certainly appreciate and have enjoyed working with you over the years and I believe that we became good friends. However, ever since the misunderstanding of the 75/25 percentage, I feel that I have been taken advantage of. I don't like that feeling at all and I'm sure that you didn't intend to do so.

. . .

I sincerely hope that you do not take this letter wrong, but I have tried to discuss this with you with no result. This letter is strictly business and I would like to see 50% on my next payment. Hope everything is good there and thanks for everything.

Ms. Wise testified that she knew she was not responsible for the storage fee, but was attempting to give Mr. Copeland some incentive to pay her what Old Hickory was owed. Ms. Wise emailed Star Coach and Mr. Copeland again in July 2015 and October 2015, but received no response. According to Mr. Copeland, Star Coach had an email address other than the two that Ms. Wise used, but Mr. Copeland stated that Star Coach did not use emails in its business. Mr. Copeland's personal email address was the one that Ms. Wise used. However, Mr. Copeland stated that he never received any emails from Ms. Wise or Old Hickory and that Ms. Wise never referenced emails to him in their telephone conversations. Ms. Wise admitted that Mr. Copeland never used emails or texts, and the parties would primarily communicate by phone instead. Ms. Wise stated that she sent the emails to have a record of her requests for payment.

On August 18, 2016, Old Hickory filed a complaint for claims of breach of contract and promissory estoppel against Star Coach and Mr. Copeland. Thereafter, Star Coach filed a motion to dismiss for lack of personal jurisdiction, which was denied by the trial court. On December 20, 2016, Star Coach filed an answer and counterclaim asserting unjust enrichment and money had and received. Old Hickory filed an answer to Star Coach's counterclaim.

A bench trial was held on January 21-22, 2020. At trial, Ms. Wise presented an accounting of what she had estimated Old Hickory was owed. Mr. Copeland provided a summary of the major repairs and renovations he performed on Old Hickory's trailers from 2010 to 2013. Following the trial, the court entered an order requesting post-trial briefs. On May 11, 2020, the trial court entered its memorandum and order. The trial court found

that "[t]here [was] no evidence in the record that Mr. Copeland assumed personal liability for any debts of Star Coach or that he personally claims a right to recover against Old Hickory on the counterclaims asserted by Star Coach." Furthermore, the trial court determined the following:

> [A]lthough Star Coach inquired about new trucks from Old Hickory and Old Hickory was financially unable to provide new trucks at that time, Old Hickory was unaware that Star Coach was not using Old Hickory's trucks to pull its new trailers. As such, Old Hickory did not materially breach the parties' agreement by failing to provide new trucks to pull its new trailers, and Star Coach is bound by the parties' agreement to provide 50% of the rental income derived from leasing the Units to Old Hickory.
>
> . . .
>
> [T]he parties agreed that Old Hickory would be responsible for the cost of repairs and renovations to its equipment, and the Court has previously determined that Star Coach informed Old Hickory of the repairs and renovations; Old Hickory was financially unable to afford the repairs and renovations at that time; Star Coach performed the repairs and renovations; and Star Coach considered the costs for repairs and renovations a debt.

The trial court awarded damages to Old Hickory in the amount of $101,529.00 for revenue-sharing income due from September 2010 to 2015 pursuant to the parties' agreement.[5] Additionally, the trial court awarded damages to Star Coach in the amount of $12,415.00 for major repairs and renovations made to Old Hickory's trailers after 2010.[6] The trial court declined to award attorneys' fees to either party. On June 5, 2020, Old Hickory filed a motion to alter or amend the judgment of the trial court claiming that Mr. Copeland was an individual defendant in the underlying case and also a party to the alleged contract in his individual capacity. The trial court entered an order denying Old Hickory's motion to alter or amend on the basis that Mr. Copeland acted in his capacity as President and CEO of Star Coach at all times. On July 13, 2020, Old Hickory timely filed this appeal.

## II.    ISSUES PRESENTED

Old Hickory presents the following issues for review on appeal:

---

[5] The trial court also awarded Old Hickory prejudgment interest in the amount of 5% per annum pursuant to Tennessee Code Annotated section 47-14-123 and post-judgment interest in the amount of 6.75% per annum pursuant to Tennessee Code Annotated section 47-14-121 and section 47-14-122.
[6] The trial court also awarded Star Coach prejudgment interest in the amount of 5% per annum pursuant to Tennessee Code Annotated section 47-14-123 and post-judgment interest in the amount of 6.75% per annum pursuant to Tennessee Code Annotated section 47-14-121 and section 47-14-122.

1. Mr. Copeland (1) is identified as a defendant in the Complaint, (2) is named a defendant in every caption, (3) was served with a summons, (4) filed an answer and counterclaim, and (5) participated in the lawsuit as a defendant. Is Mr. Copeland a defendant?
2. In their answer, Star Coach and Mr. Copeland repeatedly admitted that they entered into a contract with Old Hickory. Star Coach and Mr. Copeland also filed a counterclaim alleging that the parties had entered into a contract. Did Mr. Copeland admit that he entered into a contract with Old Hickory?

Star Coach and Mr. Copeland submit their own competing statement of the issues and additional issues. Star Coach and Mr. Copeland present the following issues for review on appeal, which we have slightly restated:

1. Whether the trial court was correct in holding that Mr. Copeland was only a party to this lawsuit in his capacity as President and CEO of Star Coach when the allegations in the Complaint dictate that he was not an individual defendant;
2. Whether the trial court was correct in holding that Mr. Copeland only ever conducted business with Old Hickory in his capacity as President and CEO of Star Coach when there was no evidence introduced at trial or otherwise in the record suggesting otherwise;
3. Whether the trial court erred in finding that the oral agreement between Old Hickory and Star Coach formed an enforceable contract;
4. Whether the trial court erred in failing to find Old Hickory was unjustly enriched and awarding quasi-contract damages to Star Coach for overpayments and expenses when there was no enforceable contract in place on the subject matter;
5. Whether, even if an enforceable oral contract was formed between Star Coach and Old Hickory, the trial court erred in finding Star Coach breached the contract and/or in awarding Old Hickory any damages; and
6. Whether, even if an enforceable oral contract was formed between Star Coach and Old Hickory, the trial court erred in not awarding quasi-contract damages to Star Coach under the theories of unjust enrichment and money had and received.

For the following reasons, we affirm the decision of the trial court.

### III. STANDARD OF REVIEW

Because this case was tried before the trial court without a jury, we review the trial court's findings of fact de novo on the record, presuming those findings to be correct unless the evidence preponderates otherwise. *Regions Bank v. Bric Constructors, LLC*, 380 S.W.3d 740, 760 (Tenn. Ct. App. 2011) (citing Tenn. R. App. P. 13(d)). "Because trial courts are able to observe witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary." *Id.* (quoting *Hughes v. Metro. Gov't of Nashville*

*& Davidson Cty.*, 340 S.W.3d 352, 360 (Tenn. 2011)).  As for contract interpretation, our standard of review is de novo on the record according no presumption of correctness to the trial court's conclusion of law.  *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006) (citations omitted).  As our supreme court has stated, "[a] cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties."  *Id.* (citing *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005)).

### IV.   DISCUSSION

On appeal, Old Hickory argues two issues in regard to the trial court's findings as to Mr. Copeland.  Those two concisely stated issues are (1) whether Mr. Copeland was a defendant; and (2) whether Mr. Copeland admitted that he entered into a contract with Old Hickory.  Alternatively, Star Coach and Mr. Copeland submit two similar issues, which are stated as follows:

1. Whether the trial court was correct in holding that Mr. Copeland was only a party to this lawsuit in his capacity as President and CEO of Star Coach when the allegations in the Complaint dictate that he was not an individual defendant; and

2. Whether the trial court was correct in holding that Mr. Copeland only ever conducted business with Old Hickory in his capacity as President and CEO of Star Coach when there was no evidence introduced at trial or otherwise in the record suggesting otherwise.

In regard to these first two issues, the parties' competing statements strike with different sides of the sword, but nonetheless, the competing statements strike at the same crux on this appeal.

### A.  Whether Mr. Copeland Admitted that He Entered into a Contract with Old Hickory

For reasons of efficiency, we first address whether Mr. Copeland admitted that he, in his individual capacity, entered into a contract with Old Hickory.  At the outset of this particular discussion, we note that it is unlikely that Mr. Copeland was a party to the agreement in his individual capacity because Ms. Wise clearly stated in communications with Mr. Copeland in June 2011 that "[t]he deal was 50 percent to Starcoach and 50 percent to [Old Hickory.]"  Still, Old Hickory contends that Mr. Copeland admitted in the answer and counterclaim that he entered into the contract, affirmatively alleged that he entered into the contract, and asserted claims against Old Hickory based on the contract.  As support for this assertion, Old Hickory's brief points to instances where the answer and counterclaim used the plural form of "Defendants," such as "Defendants agreed."  However, the same paragraphs also use the term "it" in reference to "Defendants."

We have discussed the law regarding the effect of admissions contained within a

- 11 -

defendant's answer. *Sakaan v. Fedex Corp., Inc.*, No. W2016-00648-COA-R3-CV, 2016 WL 7396050, at *4 (Tenn. Ct. App. Dec. 21, 2016). In *Sakaan*, this Court stated the following:

> It is true that when the allegations of a complaint are admitted, "the subject matter thereof is removed as an issue, no proof is necessary[,] and it becomes conclusive on the parties." *Rast v. Terry*, 532 S.W.2d 552, 554 (Tenn. 1976) (citation omitted). Indeed, "[a]dmissions in pleadings are judicial admissions that are conclusive on the pleader until withdrawn or amended." *Irvin v. City of Clarksville*, 767 S.W.2d 649, 653 (Tenn. Ct. App. 1988) (citation omitted). It is important to recognize, however, that this principle extends to admissions in pleadings regarding issues of *fact*. *See John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.*, 642 S.W.2d 151, 152 (Tenn. Ct. App. 1982) (citation omitted) ("Facts confessed in pleadings are binding on the parties[.]"). "A party is not ordinarily bound by admissions or averments of legal conclusions." *Nichols v. Blocker*, No. 87–110–II, 1988 WL 39569, at *2 (Tenn. Ct. App. Apr. 29, 1988).

*Id.* This Court concluded in *Sakaan* that the defendants' "inadvertent assent" to a legal assertion was not controlling. *Id.* Additionally, the Sixth Circuit has stated that "[j]udicial admissions of fact must be deliberate and clear, while legal conclusions are rarely considered to be binding judicial admissions." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007). Therefore, we must answer the question of whether an alleged admission that one is a party to an agreement is a question of fact or a question of law that requires a legal conclusion.

The Tennessee Supreme Court discussed the issue with the "fact/conclusion dichotomy" as follows:

> The differing viewpoints of the *Iqbal* majority and dissent illustrate a fundamental problem with the fact/conclusion dichotomy: many, if not most, allegations can be fairly described as at least having a "conclusory" aspect. The problem is generally avoided by adhering to the principles that are already well established in Tennessee for ruling on a motion to dismiss. The texts of Federal Rule of Civil Procedure 8 and Tennessee Rule of Civil Procedure 8.01 indicate that the drafters of the rules also aspired to avoid this problem: the rules do not include terms such as "fact," "conclusion," or "cause of action."
>
> This is not to say that there is absolutely no place for drawing an analytical distinction between factual assertions and legal conclusions, however; as noted, we stated in *Riggs* [*v. Brunson*] that "the legal conclusions set forth in a complaint are not required to be taken as true." [*Riggs v. Brunson*, 941 S.W.2d 44, 48 (Tenn. 1997)] (citing *Dobbs v. Guenther*, 846 S.W.2d 270,

273 (Tenn.Ct.App.1992)).

*Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 434 (Tenn. 2011). In a similar case to the case at bar, this Court found and held *as a matter of law* that a CEO executed a contract at issue both in his capacity as CEO and in his individual capacity personally guaranteeing the contract. *Wise N. Shore Props., LLC v. 3 Daughters Media, Inc.*, No. E2013-01953-COA-R3-CV, 2014 WL 2854258, at *1 (Tenn. Ct. App. June 23, 2014) (emphasis added). *Wise* and other cases have held that the execution of an individual's second signature on a contract personally guaranteeing the contract supports a finding that the clear intent of the parties to the contract was for the individual to be held personally liable. *Id.* at *3-4; *see MLG Enters., LLC v. Johnson*, 507 S.W.3d 183, 188-91 (Tenn. 2016), *rev'g MLG Enters., LLC v. Johnson*, No. M2014-01205-COA-R3-CV, 2015 WL 4162722, at *7 (Tenn. Ct. App. July 9, 2015). In this situation, "courts must bear in mind 'the general rule regarding the signature of a corporate representative' in conjunction with our supreme court's statement regarding 'the clear intent of the parties as gleaned from the Contract itself.'" *Hight v. Tramel*, No. M2019-00845-COA-R3-CV, 2020 WL 6748789, at *5 n.5 (Tenn. Ct. App. Nov. 17, 2020) (quoting *Wise*, 2014 WL 2854258, at *2).

This Court has also differentiated between an admission of the existence of a contract and an admission that a contract is binding and enforceable. *Nichols*, 1988 WL 39569, at *2. In *Nichols*, we explained the difference as follows:

> It is true that the admission of the existence of a contract is binding upon the party who so pleads. However, the admission of the existence of a contract is not an admission of a binding, enforceable contract.
>
> A party is not ordinarily bound by admission or averments of legal conclusions, as for example, an admission as to the legal effect of a written instrument or by the name given to it.

*Id.* at *2 (citing 71 C.J.S. *Pleading* § 59(d)). Thus, a party may admit the existence of a contract, but that admission does not establish whether the contract is one that is enforceable and has bound certain parties to its obligations. It is for a court to determine the legal effect of a contract, and consequently, a party is not ordinarily bound to an admission or averment concerning the legal effect of a contract because it is a legal conclusion for the court to make. *See id.*

Unfortunately, since this case involves an oral agreement between the parties, we do not have the benefit of a written contract in this case "to ascertain and give effect to the intent of the parties." *Watson*, 195 S.W.3d at 611 (citing *Christenberry*, 160 S.W.3d at 494). Regarding oral agreements, the Tennessee Supreme Court has explained that:

> [A] court [is not] required to accredit an affiant's legal conclusions, such as Mr. Battah's characterizations of the relationships between [defendant] and

- 13 -

its distribution companies, or Mr. Battah's belief that he had an informal, "oral" distribution agreement that included NV Sumatra as a party. Mr. Battah has not demonstrated that he possesses the expertise necessary to draw conclusions of this sort, and the record contains no documentary or other reliable evidence to support them.

*State v. NV Sumatra Tobacco Trading Co.*, 403 S.W.3d 726, 735 n.22 (Tenn. 2013). We are persuaded from a reading of the case law that a party is not bound by an admission that it is a party to an oral contract because that is a legal conclusion, the determination of which properly rests with the court. *See Sakaan*, 2016 WL 7396050, at *4 ("[Plaintiff] correctly cites the law regarding the effect of admissions contained within a defendant's answer. . . . In our opinion, [Plaintiff's] averment . . . amounted to nothing more than a legal conclusion, the determination of which would properly rest with the trial court."). Accordingly, regardless of whether Mr. Copeland allegedly admitted that he—in his individual capacity—entered into a contract with Old Hickory in the answer or counterclaim, we conclude that Mr. Copeland would not be bound by this admission because it is a legal conclusion not required to be taken as true. A court is not required to accredit a party's legal conclusions, particularly those that conclude whether an oral agreement includes certain parties. *See NV Sumatra Tobacco Trading Co.*, 403 S.W.3d at 735 n.22. What Old Hickory contends was an admission of personal liability by Mr. Copeland, we view as nothing more than an "inadvertent assent" to a legal assertion. *Sakaan*, 2016 WL 7396050, at *4. Therefore, we cannot find that there was an admission by Mr. Copeland that he was an individual party to the contract. Because Old Hickory limits its argument to the implications of Mr. Copeland's admissions, we need not address whether Mr. Copeland was actually personally liable for the contract because "[a]ppellate review is generally limited to the issues that have been presented for review."[7] *Hodge v. Craig*, 382 S.W.3d 325, 334 (Tenn. 2012).

### B. Whether Mr. Copeland was a Defendant

We now address the issue of whether Mr. Copeland was a defendant. In its memorandum and order, the trial court began its discussion on personal liability with the following sentence: "Old Hickory purports to sue Mr. Copeland in his personal capacity for breach of contract." The trial court then concluded that there was no evidence in the record that Mr. Copeland assumed personal liability for any debts of Star Coach or that he personally claimed a right to recover against Old Hickory on the counterclaims asserted by Star Coach. In response, Old Hickory filed a motion to alter or amend the judgment of the trial court claiming that Mr. Copeland was an individual defendant in the underlying case and also a party to the alleged contract in his individual capacity. However, the trial court denied this motion stating that "the parties' generous use of plural references in the

---

[7] We do note, however, that even Ms. Wise characterized in her letter in June 2011 that "[t]he deal was 50 percent to Starcoach and 50 percent to [Old Hickory.]"

pleadings should not be construed to create a contractual obligation which, under the unique circumstances present here, does not appear to be contemplated by the parties." In its order on the motion to alter or amend, the trial court initially and inexplicably appeared to question whether Mr. Copeland was named as an individual defendant in the first place but nevertheless reiterated its finding in its memorandum and order as follows:

> *As previously determined in the Court's May 11, 2020 Memorandum and Order, to the extent Old Hickory is asserting personal liability* against Mr. Copeland on the theory that Mr. Copeland was a party to the revenue-sharing contract, the Court determines that Mr. Copeland was a party to the contract in his official capacity as President and CEO of Star Coach only. There is no evidence in the record that Mr. Copeland assumed personal liability for any debts of Star Coach or that he personally claims a right to recover against Old Hickory on the counterclaims asserted by Star Coach. Rather, the evidence demonstrates that Mr. Copeland was acting at all times relevant hereto as the President and CEO of Star Coach.

(emphasis added).

Regardless of the court's statement questioning whether Mr. Copeland was a defendant to the case, the trial court, by the terms of its order, considered the potential personal liability of Mr. Copeland. After the trial and consideration of the post-trial motion, the court found no evidence of any personal liability against Mr. Copeland. Based upon our findings regarding a lack of admission that he was a party, and the trial court's ultimate consideration of the potential liability of Mr. Copeland, we determine that this Court need not reach the initial technicality of whether Mr. Copeland was a defendant, or more precisely, whether Mr. Copeland was properly identified as a party defendant in the complaint and given proper notice that he was being sued in his individual capacity. Even assuming arguendo that he was *named* in his individual capacity, the trial court found that Old Hickory did not *prove* personal liability against Mr. Copeland and Mr. Copeland should not be held personally liable for the damages awarded to Old Hickory. The trial court made that abundantly clear stating that "to the extent Old Hickory is asserting personal liability against Mr. Copeland . . . , the Court determines that Mr. Copeland was a party to the contract in his official capacity as President and CEO of Star Coach only." Old Hickory conceded in its post-trial brief that the question of piercing the corporate veil was not before the trial court. Moreover, aside from the issue regarding admissions, Old Hickory does not raise the issue of personal liability on appeal and we are "limited to the issues that have been presented for review." *Hodge*, 382 S.W.3d at 334. Thus, we find no merit in this issue.

### C. Star Coach's Additional Issues

i.    *Formation of an Enforceable Contract*

- 15 -

Star Coach presents four additional issues on appeal. The first of those is whether the trial court erred in finding that the oral agreement between Old Hickory and Star Coach formed an enforceable contract under the statute of frauds. The Tennessee statute of frauds requires in part that:

(a) No action shall be brought:

. . .

(5) Upon any agreement or contract which is not to be performed within the space of one (1) year from the making of the agreement or contract;

unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party.

Tenn. Code Ann. § 29-2-101(a)(5). This Court has noted that if an oral contract is formed, "the statute of frauds would not bar its enforcement because it was possible for defendant to complete performance within one year." *Tolliver v. Tellico Vill. Prop. Owners Ass'n, Inc.*, 579 S.W.3d 8, 29 n.12 (Tenn. Ct. App. 2019); *see* Tenn. Code Ann. § 29-2-101(a)(5); *Boutwell v. Lewis Bros. Lumber Co.*, 182 S.W.2d 1, 3 (Tenn. Ct. App. 1944) ("The mere fact that the contract might continue for more than a year does not bring it within the statute . . . . Nor is improbability of performance sufficient if the contract is susceptible to being performed within the year[.]" (citations omitted)). In *Boutwell*, this Court found the following excerpt from the *Corpus Juris Secundum* to be supportive:

'The question is not what the probable, expected, or actual performance of the contract may be, but whether, according to the reasonable interpretation of its terms, it requires that it should not be performed within the year. Unless the court, looking at the contract in view of the surroundings, can say that in no reasonable probability can such agreement be performed within the year, it is its duty to uphold the contract.'

*Boutwell*, 182 S.W. 2d at 3 (quoting 37 C.J.S., *Frauds, Statute of*, § 44).

At trial, Mr. Copeland explained that, early on, production companies would enter into five-year contracts with his business. However, as time went on the production companies became unsure about renewal, and thus, they changed to annual contracts. Mr. Copeland stated that "[c]ontracts ran from year to year," and a normal season of leasing to production companies was "[a]pproximately 26 weeks." The trial court found that "it [was] possible that the parties' agreement could have been fully performed within the space of

- 16 -

one year." We agree. It was possible for the contract to be completed within one year, and consequently, the statute of frauds does not bar the enforcement of this oral agreement. Therefore, we find that the trial court did not err in finding that the oral agreement between Old Hickory and Star Coach formed an enforceable contract. Furthermore, because we find that the statute of frauds does not bar enforcement of this contract, we need not consider the partial performance exception to the statute of frauds.

### ii. Unjust Enrichment and Quasi-Contract Damages If There Was No Enforceable Contract

The second issue raised by Star Coach is whether the trial court erred in failing to find Old Hickory was unjustly enriched and failing to award quasi-contract damages to Star Coach for overpayments and expenses when there was no enforceable contract in place on the subject matter. Because we have previously found that there was an enforceable contract, this issue on unjust enrichment and quasi-contract damages is pretermitted.

### iii. Breach of Contract and/or Award of Damages

Star Coach's third issue is whether, even if an enforceable oral contract was formed between Star Coach and Old Hickory, the trial court erred in finding Star Coach breached the contract and/or in awarding Old Hickory any damages. Specifically, Star Coach argues that it did not breach the contract, but that any breach it may have committed was preceded by Old Hickory's prior material breach. Star Coach further argues that the trial court erred by finding that it had waived any right to assert Old Hickory's first material breach of the contract, and that Star Coach paid Old Hickory "every dollar to which Old Hickory was entitled."

The trial court found that there was no evidence in the record that Mr. Copeland informed Ms. Wise that Star Coach was going to keep 100% of the rental income from the trucks while only paying Old Hickory one-half of the rental income derived from the trailers. Furthermore, the trial court found that Star Coach was responsible for paying Old Hickory 50% of the rental income for each trailer-truck unit, not just the trailers, in accordance with the parties' agreement. Therefore, the trial court held that Star Coach did not overpay Old Hickory, but rather, underpaid it.

To begin, we note that in Tennessee, "[r]equiring notice and a reasonable opportunity to cure defects in the performance of a contract is a sound principle." *Custom Built Homes by Ed Harris v. McNamara*, No. M2004-02703-COA-R3-CV, 2006 WL 3613583, at *5 (Tenn. Ct. App. Dec. 11, 2006) (citing *Carter v. Krueger*, 916 S.W.2d 932, 935 (Tenn. Ct. App. 1995)). In arguing that it did not breach the contract, Star Coach claims that both the trial court and Old Hickory misconstrue this Court's holding in *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194 (Tenn. Ct. App. 1990). In that case, this Court explained that "[r]equiring notice is a sound rule designed to allow the defaulting

party to repair the defective work, to reduce the damages, to avoid additional defective performance, and to promote the informal settlement of disputes." *Id.* at 198 (citing *Pollard v. Saxe & Yolkes Dev. Co.*, 525 P.2d 88, 92 (1974); *Sturdy Concrete Corp. v. Nab Constr. Corp.*, 411 N.Y.S.2d 637, 644 (1978)). "Notice ought to be given when information material to the performance of a contract is within the peculiar knowledge of only one of the contracting parties." *Id.* Applying the duty of notice to the facts of the case at bar, we fail to see a misconstruction of *McClain* by the trial court and Old Hickory.

Despite the conflicting testimony of the parties, the trial court credited both Mr. Copeland's and Ms. Wise's testimonies on this issue.[8] We reiterate that "trial courts are able to observe witnesses, assess their demeanor, and evaluate other indicators of credibility," and therefore, "an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary." *Regions Bank,* 380 S.W.3d at 760 (quoting *Hughes v. Metro. Gov't of Nashville & Davidson Cty.*, 340 S.W.3d 352, 360 (Tenn. 2011)). The trial court found no evidence in the record that Mr. Copeland informed Ms. Wise that Star Coach was going to keep 100% of the rental income from the trucks while only remitting payment to Old Hickory for half of the rental income derived from the trailers. Just as the trial court found, we conclude that although some discussion about new trucks occurred between the parties, Ms. Wise was not aware that her trucks were not being used thereafter. Though the parties' testimony was indistinct about what exactly occurred relating to the new trucks, the record provided to this Court on appeal lacks evidence that demonstrates Old Hickory was on notice that it must provide new trucks. Consequently, because Ms. Wise had no notice that Old Hickory's trucks were not being used, she also had no notice that Star Coach was going to keep 100% of the rental income derived from the trucks in the absence of Old Hickory providing new trucks. Regardless of whether Old Hickory's failure to provide new trucks would have been material, we find that Star Coach failed to satisfy the notice requirement as explained by this Court in *McClain*. *McClain,* 806 S.W.2d at 198. Without giving Old Hickory proper notice that the contract with the production company could not continue without new trucks, Star Coach chose to provide the trucks itself and continued leasing equipment to the production company. Therefore, Star Coach breached the agreement with Old Hickory when it began withholding the portion of the rental income that Old Hickory was entitled to because Star Coach failed to impart "information material to the performance of [their] contract." *Id.*

Despite breaching the contract by withholding a portion of the rental income owed to Old Hickory, Star Coach contends that the trial court erred in holding that Old Hickory's failure to provide new trucks was not a first material breach of the contract which preceded Star Coach's breach. "[A] party who commits the first uncured material breach of contract may not recover damages for the other party's material breach." *Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 812 (Tenn. Ct. App. 2009) (citations omitted).

---

[8] Although the trial court credited both Mr. Copeland's and Ms. Wise's testimony, their accounts of the details of their transactions through the years differ greatly.

Therefore, only Old Hickory's uncured material failure to perform its obligations under the contract would have excused Star Coach from performing its remaining obligations, those being payment to Old Hickory. *See McClain*, 806 S.W.2d at 199. However, "[a] party owed performance may . . . waive its right to assert the first uncured material breach as a bar to recovery on its own subsequent breach." *Madden Phillips*, 315 S.W.3d at 812 (citations omitted). In *Madden Phillips*, this Court discussed the issue of waiver as follows:

> Waiver is an affirmative defense. Tenn. R. Civ. P. 8.03. A party who raises the issue of waiver has the burden of proving it by a preponderance of the evidence. *Jenkins Subway, Inc. v. Jones*, 990 S.W.2d 713, 722 (Tenn.Ct.App.1998) (citations omitted). This burden requires proof of some "'absolute action or inaction inconsistent with the claim or right' waived." *Id.* (quoting *Koontz v. Fleming*, 17 Tenn.App. 1, 65 S.W.2d 821, 825 (1933)).

*Id.* at 813-14. Moreover, this Court recognized that "[i]n general, by accepting benefits under a contract with knowledge of a breach, the non-breaching party waives the breach." *Id.* at 815 (quoting *94th Aero Squadron of Memphis, Inc. v. Memphis-Shelby Cty. Airport*, 169 S.W.3d 627, 635-36 (Tenn. Ct. App. 2004)). A non-breaching party waives a breach "by 'express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was [the party's] intention and purpose to waive.'" *Id.* (quoting *Aero Squadron*, 169 S.W.3d at 636). Ultimately, this Court concluded in *Madden Phillips* that the non-breaching party waived its right to assert the breaching party's suspension of performance as the first uncured material breach. *Id.* at 816. In *Carter v. Krueger*, this Court followed *McClain* and held the following:

> Without question, the first breach was attributable to the appellee in that he failed to construct the addition to the appellant's building in accordance with the standards imposed upon him. We cannot say, however, that his breach was an 'uncured material breach' because he was never given proper notice of the claimed defects or an opportunity to 'cure' the breach.

*Carter*, 916 S.W.2d at 937.

Star Coach contends that it did not waive its right to assert Old Hickory's first material breach as a bar to Old Hickory's breach of contract claim and that Star Coach paid Old Hickory "every dollar to which Old Hickory was entitled." We cannot agree. We find that Star Coach, through its course of acts and conduct, waived its right to assert that Old Hickory committed the first uncured material breach. As stated before, "by accepting benefits under a contract with knowledge of a breach, the non-breaching party waives the breach." *Madden Phillips*, 315 S.W.3d at 815 (quoting *Aero* Squadron, 169 S.W.3d at 635-36). Although Old Hickory did not provide new trucks, Star Coach continued under the contract with Old Hickory after the new trailers were ordered and delivered. Star Coach

- 19 -

began reducing payments around 2011, but the parties continued to work together until 2015. Old Hickory did not provide new trucks, but Star Coach retained possession of Old Hickory's trucks and trailers and continued to use the trailers to rent to production companies.

Similar to the holding in *Carter*, the first breach may arguably have been attributable to Old Hickory in that it failed to provide new trucks. *Carter*, 916 S.W.2d at 937. However, by continuing under the revenue-sharing agreement, Star Coach waived its right to assert Old Hickory's alleged first material breach as a bar to Old Hickory's breach of contract claim. Old Hickory was not being paid what it was entitled to under the agreement once Star Coach unilaterally began reducing payments.

> iv.  *Quasi-Contract Damages Under the Theories of Unjust Enrichment and Money Had, Money Received*

The final issue presented by Star Coach is whether, even if an enforceable oral contract was formed between Star Coach and Old Hickory, the trial court erred in not awarding quasi-contract damages to Star Coach under the theories of unjust enrichment and "money had, money received." Having found that there was an enforceable contract, we now address Star Coach's contention that these quasi-contractual damages should be awarded to them despite a finding of an enforceable contract.

First, Star Coach contends that it was entitled to quasi-contract damages under the money had and received theory for the overpayments to Old Hickory. The claim for money had and received is at least two centuries old in the State of Tennessee, as evidenced in the Tennessee Superior Court of Law and Equity's decision in *Boyd v. Anderson*, 1 Tenn. 438, 440 (1809) and *Herd v. Vincent*, 1 Tenn. 369, 369 (1808). In analyzing the claim for money had and received, this Court has stated:

> The action for money had and received is based upon an implied assumpsit. It is an action at law, and properly cognizable in a court of law, and "is maintainable in all cases where one person has received money or its equivalent under such circumstances that in equity and good conscience he ought not to retain it and ex aequo et bono it belongs to another."

*Interstate Life & Acc. Co. v. Cook,* 86 S.W.2d 887, 891 (Tenn. Ct. App. 1935) (citations omitted). Star Coach further claims that the trial court erred in not finding that Old Hickory was unjustly enriched by Star Coach and not awarding Star Coach damages to its expense from repairs, renovations, and replacements to Old Hickory's trailers. Regarding unjust enrichment, the Tennessee Supreme Court has explained that:

> Actions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same. Courts

- 20 -

frequently employ the various terminology interchangeably to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between parties, regardless of their assent thereto.

*Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966). More recently, this Court has explained that "[b]oth unjust enrichment and money had and received are essentially the same cause of action, being both quasi-contractual actions." *Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747, 755 (Tenn. Ct. App. 2006).

Star Coach cites to *Farmers & Merchants Bank v. Midway Supply Co., Inc.*, No. M1999-00147-COA-R3-CV, 2000 WL 356340, at *5 (Tenn. Ct. App. April 7, 2000), arguing that money had and received should be awarded despite a finding of an enforceable contract. In that case, this Court reiterated its holding from *Interstate Life & Accident Co. v. Cook*, stating the following:

> It is well settled in Tennessee that money paid upon consideration that subsequently fails may be recovered. *See Walker v. Walker*, 3 Tenn.Civ.App. 670, 686 (1913). An action for money had and received is based upon an implied assumpsit. It is properly cognizable in a court of law and may be maintained where one receives money or its equivalent under such circumstances that in equity and good conscience he ought not to retain and in justice and fairness it belongs to another. *Interstate Life & Accident Co. v. Cook*, 19 Tenn.App. 290, 86 S.W.2d 887, 891 (1935).

*Farmers & Merchs. Bank*, 2000 WL 356340, at *5. Star Coach also cites to *Markow v. Pollock*, No. M2008-01720-COA-R3-CV, 2009 WL 4980264, at *4 (Tenn. Ct. App. Dec. 22, 2009), arguing that unjust enrichment damages should be awarded despite the existence of a contract. In that case, this Court stated that "[t]o resolve unjust enrichment claims, courts may impose a contractual relationship between the parties, regardless of their assent." *Markow*, 2009 WL 4980264, at *4; *see Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d at 755.

We cannot find that these quasi-contractual damages should be awarded when there has been a finding of an enforceable contract. It is well-established that a "quasi-contractual theory" such as unjust enrichment or money had and received is one "in which a court may impose a contractual obligation where one does not exist." *B & L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189, 217 (Tenn. Ct. App. 2004) (citing *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998)). "Courts will impose a contractual obligation under an unjust enrichment theory when: (1) there is no contract between the parties or a contract has become unenforceable or invalid; and (2) the defendant [or plaintiff] will be unjustly enriched absent a quasi-contractual obligation." *Holloway*, 973 S.W.2d at 596. "Where a contract is invalid or unenforceable, the court

may impose a contractual obligation when the defendant will be unjustly enriched absent a quasi-contractual obligation.  *ICG Link, Inc. v. Steen*, 363 S.W.3d 533, 546 (Tenn. Ct. App. 2011) (citing *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 197 (Tenn. 2001)).  In our case, we have found that there is an enforceable contract which obligated both parties to certain terms.  Therefore, we find that the trial court properly denied Star Coach's requests for quasi-contract damages under the theories of unjust enrichment and money had and received.

## V.    CONCLUSION

For the aforementioned reasons, we affirm the decision of the trial court.  Costs of this appeal are taxed to the appellant, Old Hickory Coaches, LLC, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE